Welch v. McLean

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-02-237-CV

ROBERT MORROW WELCH, M.D. APPELLANT

V.

SIMEON EDEN MCLEAN, INDIVIDUALLY APPELLEES

AND AS HEIR TO THE ESTATE OF 

DELORES MCLEAN, DECEASED, AND 

SIMEON EDEN MCLEAN, AS NEXT FRIEND 

OF JAMILA IMARI MCLEAN AND IMANI 

ZAKIYA MCLEAN, MINORS

------------

FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY

------------

OPINION ON REHEARING

------------

We withdraw our opinion and judgment of March 25, 2004 and substitute the following in their place.  We grant Simeon Eden McLean’s motion for rehearing
(footnote: 1) and deny his motion for en banc rehearing.

Introduction

In this medical malpractice case, the primary issues we must decide are whether the evidence is legally and factually sufficient to support the jury’s verdict that Robert Morrow Welch, M.D.’s failure to diagnose pulmonary emboli in Delores McLean on April 24, 1996 was a proximate cause of her death from a massive pulmonary embolus two-and-a-half months later; whether the trial court erred in refusing to apply the noneconomic damages cap of the Medical Liability and Insurance Improvement Act to the jury’s damages award based on a finding that facts exist that would enable the health care provider to invoke the 
Stowers
 doctrine; whether the trial court erred in failing to include prejudgment interest in the damages cap; and whether the trial court incorrectly applied the settlement credit to the capped damages.  Because we hold that the evidence is both legally and factually sufficient to support the jury's verdict and that the trial court correctly applied the settlement credit, but that the trial court erred in refusing to apply the damages cap to the jury's damages award and prejudgment interest, we reverse and render.

Background Facts and Procedural History

On April 24, 1996, thirty-year-old Delores called Dr. Mark Godfrey, her primary care physician, complaining of shortness of breath and chest pain.  Dr. Godfrey sent Delores to the emergency room at Harris Methodist Hospital HEB (hereafter, the emergency room) for further evaluation.  Delores’s husband, Simeon, drove her to the emergency room.  Simeon observed that Delores seemed to be experiencing pain when she breathed, that she held her chest, and that she struggled to breathe.  

When she arrived at the hospital at approximately 12:30 p.m., Delores was assessed by Raenita Pearson, the triage nurse on duty that day.  Pearson observed that Delores had a blood pressure of 130 over 72, pulse of 101, and respirations of 28, with a normal temperature.  She noted that Delores complained of shortness of breath the week before, headache the day before, vomiting that day, and difficulty breathing.  Delores did not, however, complain to Pearson about chest pain.  

Delores was then evaluated at 12:40 p.m. by staff nurse Meagan Stillwagoner.  Stillwagoner noted that Delores complained of a sinus headache that medication did not improve, nausea, vomiting, and shortness of breath, mainly with exertion.  Delores also had shallow and rapid respirations and a low blood oxygen saturation of 90%.  Her breath sounds were normal, however, and she was breathing with normal effort.  

Dr. Welch first saw Delores about 1:10 p.m.  He reviewed her history, which was consistent with her earlier conversations with the nurses and noted the presence of sinus drainage, a productive cough with green mucus, and her complaint of shortness of breath.  Delores did not complain to Dr. Welch about chest pain, and he did not observe any physical signs of chest pain.  Dr. Welch ordered a chest x-ray, a sinus x-ray, pulse oximetry, and an arterial blood gas test.
(footnote: 2)  He also examined Delores’s legs for evidence of thrombosis (the formation or presence of a blood clot within a blood vessel).  Because of Delores’s severe obesity, however, he did not consider that examination very useful.  

Delores’s x-rays were normal.  The pulse oximetry, however, showed an oxygen saturation level that was below normal, and the blood gas test showed a low pO
2
 of 56.  Based on Delores’s history, physical examination, x-rays, and laboratory data, Dr. Welch diagnosed Delores as suffering from sinusitis, dyspnea, bronchospasm, and hypoxemia.
(footnote: 3)  Dr. Welch believed that Delores’s shortness of breath was caused by her obesity, bronchospasm, infection, and mucus plugging in her lungs.  He ordered ventilator treatments with drugs to relieve the bronchospasm, antibiotics to treat the infection, and cough medication.  

Altogether, Dr. Welch saw Delores five or six times on April 24.  He noted slow improvement after the prescribed therapy and that Delores reported feeling almost normal.  At 4:00 p.m., Dr. Welch noted that Delores was “[d]oing well”; however, her 4:00 p.m. oxygen saturation reading gave him the impression that her bronchospasm was returning.  Dr. Welch did not see Delores between 4:00 and 5:25 p.m., when he discharged her after discussing with her his diagnosis, prescribing medication to relieve the symptoms of bronchospasm, giving her an instruction sheet for home treatment of asthma (the hospital had no instructions for bronchospasm), and suggesting that she see her primary care physician in a day or two.  Dr. Welch never saw Delores again.  

Following Dr. Welch’s instructions, Delores made an appointment with Dr. Godfrey on April 29, 1996.  Delores told Dr. Godfrey that she had been treated at the emergency room and was slowly getting better, although she still became short of breath upon exertion.  Although Delores showed Dr. Godfrey the asthma instruction sheet she had been given, he received no other information from the emergency room about Delores’s April 24 visit.  Dr. Godfrey examined Delores and concluded that she had a sinus infection and that her shortness of breath was caused by bronchospasm or reactive airway disease, which can develop suddenly after a bout of bronchitis.  He extended her antibiotics and gave her an inhaler.  If Dr. Godfrey had known of Delores’s April 24 pO
2
 level of 56, however, that might have made a difference in his evaluation of her, because he knew that catastrophic problems, such as heart attack and pulmonary embolism, could result from such a low level of oxygenation.

Dr. Godfrey next saw Delores on May 1, 1996, when she complained of chills, sore throat, headache, and ear pain.  On May 7, 1996, Delores again sought treatment from Dr. Godfrey for cold sweats, nausea, vomiting, diarrhea, labored breathing, chills, and a low-grade fever.  She told Dr. Godfrey on that visit that her respiratory symptoms were improving and that her main problems were gastrointestinal.  

On May 13, 1996, Delores consulted Dr. Drake, another physician in Dr. Godfrey’s group, regarding breathing difficulties, which then improved until the Sunday before July 3, 1996.  On July 3, Delores again saw Dr. Godfrey and complained of a recent onset of cough, congestion, wheezing, and shortness of breath.  Dr. Godfrey told Delores to restart her medications, which he had previously prescribed for use only as needed, and also gave her additional medications.  

On July 8, 1996, Delores returned to the emergency room, complaining of cough, congestion, fever, headache, sore throat, and difficulty breathing, which she reported had been intermittent since April.  She also reported coughing up red-tinged mucous and complained of tightness in her chest when she breathed.  A chest x-ray showed an abnormality in the upper right lobe of her lung, and based on Delores’s history, Dr. Jerome Novotny, the treating ER physician, concluded that she had pneumonia.  

Late in the evening on July 9, Delores collapsed at home and was taken to the emergency room by ambulance.  She was pronounced dead shortly after midnight on July 10, 1996.  Autopsy results revealed that the cause of Delores’s death was a massive “saddle” embolus that had lodged itself in her pulmonary arterial trunk.  The autopsy further revealed evidence of left deep leg vein thrombosis and showed that Delores had another, not-yet-fatal embolus in the upper lobe of her right lung, which Dr. Novotny had mistaken for pneumonia.

During the autopsy, Deputy Chief Medical Examiner Dr. Marc Krouse  retained random samples of Delores’s normal-appearing lung tissue and a section of the right upper lobe of the lung that appeared abnormal.  Two years later, Dr. Krouse prepared slides from the normal-appearing tissue for microscopic examination.  One slide showed three microscopic emboli in two of the smaller pulmonary arteries.  Based on their size, it was Dr. Krouse’s opinion that, in reasonable medical probability, these emboli were in Delores’s lungs at least four to six weeks before she died.
(footnote: 4)  Two other slides showed emboli that were seven days to two-and-one-half weeks old when Delores died.

Simeon filed his medical malpractice suit on February 1, 1998.  After a mistrial, Simeon’s claims against Dr. Welch were retried to a jury, which returned a 10-2 verdict on February 2, 2002.  The jury found that Dr. Welch’s negligence had proximately caused Delores’s death and that Simeon had suffered past and future noneconomic damages of $5,154,000.  The trial court rendered judgment on the verdict, and this appeal followed.

Sufficiency of the Evidence

In his first and second issues, Dr. Welch asserts that the evidence is legally and factually insufficient to sustain the jury’s verdict that his negligence in failing to diagnose pulmonary emboli in Delores was the proximate cause of her death.  He contends that there is no direct physical evidence that Delores was suffering from pulmonary emboli at the time he treated her on April 24, 1996 and that the experts’ opinions that she did have a pulmonary embolism on that date are speculative.  Importantly, Dr. Welch does not argue that if Delores was, in fact, suffering from a pulmonary embolism when he treated her, he was not negligent in failing to diagnose the condition or his negligence did not proximately cause her death.  Thus, if on review of the record we determine that there is legally and factually sufficient evidence that Delores was suffering from a pulmonary embolism on April 24, 1996, we must uphold the negligence and proximate cause findings.

Elements of Medical Malpractice Claim

A plaintiff in a medical malpractice case is required to prove by a preponderance of the evidence that the defendant’s negligence proximately caused his injuries.  
Duff v. Yelin,
 751 S.W.2d 175, 176 (Tex. 1988).  To do this, the plaintiff must prove four elements:  (1) a duty by the physician to act according to applicable standards of care; (2) a breach of the applicable standard of care; (3) an injury; and (4) a causal connection between the breach and the injury.  
Denton Reg’l Med. Ctr. v. LaCroix,
 947 S.W.2d 941, 950 (Tex. App.—Fort Worth 1997, pet. dism’d by agr.).  The standard of care is the threshold issue that a plaintiff must establish before the factfinder determines if the defendant doctor deviated from the standard of care to a degree that constitutes negligence.  
See id.
  As a general rule, expert testimony is required to establish the governing standard of care and whether that standard has been breached.  
See Hood v. Phillips,
 554 S.W.2d 160, 165-66 (Tex. 1977); 
LaCroix,
 947 S.W.2d at 950.

To establish proximate cause, the plaintiff must prove foreseeability and cause-in-fact.  
Leitch v. Hornsby
, 935 S.W.2d 114, 118-19 (Tex. 1996).
  With regard to cause-in-fact, the plaintiff must establish a causal connection between the defendant’s negligence and the plaintiff’s injuries based upon a “reasonable medical probability” or “reasonable probability” and not on mere conjecture, speculation, or possibility.  
Park Place Hosp. v. Estate of Milo
, 909 S.W.2d 508, 511 (Tex. 1995); 
Lenger v. Physician’s Gen. Hosp., Inc.,
 455 S.W.2d 703, 706 (Tex. 1970); 
Marvelli v. Alston
, 100 S.W.3d 460, 470 (Tex. App.—Fort Worth 2003, pet. denied).  Whether an expert opinion establishes a causal connection based upon a reasonable medical probability must be determined by the substance and context of the testimony rather than semantics or the use of a particular term or phrase.  
Burroughs Wellcome Co. v. Crye,
 907 S.W.2d 497, 500 (Tex. 1995); 
Marvelli,
 100 S.W.3d at 470.

The trier of fact may decide the issue of proximate cause in medical malpractice cases based upon (1) general experience and common sense from which reasonable persons can determine causation, (2) scientific principles provided by expert testimony allowing the fact finder to establish a traceable chain of causation from the condition back to the event, or (3) a probable causal relationship as articulated by expert testimony.  
Lenger,
 455 S.W.2d at 706; 
Marvelli
, 100 S.W.3d at 470.  Whether emboli were present in Delores’s lungs when Dr. Welch examined her in the emergency room on April 24, 1996 was clearly not a matter of common knowledge or within the experience of lay persons.  Therefore, expert medical testimony based on reasonable medical probability was required to establish either a “traceable chain of causation” based upon general scientific principles or a “probable causal relationship” between Delores’s medical condition in late April 1996 and her death two-and-a-half months later on July 10.  
See Marvelli,
 100 S.W.3d at 470.

Legal Insufficiency

In determining a “no-evidence” issue, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary.  
Bradford v. Vento, 
48 S.W.3d 749, 754 (Tex. 2001)
; Cont’l Coffee Prods. Co. v. Cazarez, 
937 S.W.2d 444, 450 (Tex. 1996);
 In re King's Estate
, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).  Anything more than a scintilla of evidence is legally sufficient to support the finding.  
Cazarez,
 937 S.W.2d at 450;
 Leitch v. Hornsby
, 935 S.W.2d at 118.  More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact.  
Rocor Int’l, Inc. v. Nat’l Union Fire Ins. Co.  of Pittsburgh
, 77 S.W.3d 253, 262 (Tex. 2002).

“[Expert] opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact ‘more or less probable.’”  
Coastal Transp. Co. v. Crown Cent. Petro. Corp.,
 136 S.W.3d 227, 232 (Tex. 2004); 
see also
 
Tex. R. Evid.
 401.  Such testimony is incompetent evidence and cannot support a judgment.  
Coastal Transp. Co.,
 136 S.W.3d at 232.  “When the expert ‘brings to court little more than his credentials and a subjective opinion,’ this is not evidence that would support a judgment.”  
Merrell Dow Pharms., Inc. v. Havner,
 953 S.W.2d 706, 712 (Tex. 1997).

There is no need to go beyond the face of the record to test the reliability of expert testimony that is challenged as merely conclusory or speculative on its face.  
Coastal Transp. Co.,
 136 S.W.3d at 233.  When, however, the challenge to the testimony requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert in forming his or her opinion, a timely objection must be made in the trial court when the 
testimony is offered to preserve the issue for appellate review.  
Id.; Mar. Overseas Corp. v. Ellis,
 971 S.W.2d 402, 409 (Tex.), 
cert. denied
, 525 U.S. 1017 (1998).

In this case, the evidence and reasonable inferences that support the jury’s verdict are summarized as follows:

On April 24, 1996, Delores presented to the emergency room with numerous clinical symptoms
(footnote: 5) that Simeon’s experts testified were consistent with a pulmonary embolus.  One of Simeon’s experts, Dr. Maria Granzotti, opined that Delores’s normal chest x-ray, occurring as it did in the setting of acute shortness of breath coupled with hypoxemia (deficient oxygenation of the blood), was “highly suggestive” of a pulmonary embolus.  She testified that Delores’s abnormal A-a gradient was one of the “key factors” that increased the suspicion of pulmonary embolus and stated that she believed Delores’s tachycardia and low oxygen saturation level were caused by showers of small pulmonary emboli.  Dr. Granzotti opined that, in reasonable medical probability, the breathing problems Delores was experiencing when she presented to the emergency room in April 1996 had the same origin as the breathing difficulties she had when she returned to the emergency room on July 8, the day before she died of a pulmonary embolism. 

Another of Simeon’s medical experts, Dr. Krouse, opined that Delores’s blood gas levels and negative x-rays in April 1996 were, in reasonable medical probability, more likely than not related to thromboembolic disease or showers of thromboemboli.  He further testified that Delores’s clinical symptoms on April 24, 1996, her complaint of chest pain to Dr. Godfrey before she went to the emergency room, and the typical history of thromboembolic lung disease—when correlated with the pathological evidence showing that microscopic pulmonary emboli were present in her lungs at least four to six weeks before her death—demonstrated a “high probability” that showers of microscopic emboli were occurring in her lungs when she presented to the emergency room in April 1996.

Dr. Welch complains that this expert testimony is not probative evidence that Delores suffered from pulmonary emboli at the time he treated her because the symptoms, risk factors, and physical evidence underlying Drs. Granzotti’s and Krouse’s opinions only permit speculation that Delores suffered from  that condition when she saw Dr. Welch.  This argument requires us to look beyond the face of what Drs. Granzotti and Krouse said and evaluate the underlying basis of their opinions.  
See Coastal Transp. Co.,
 136 S.W.3d at 232-33; 
Mar. Overseas Corp.,
 971 S.W.2d at 412; 
see also Gammill v. Jack Williams Chevrolet, Inc.,
 972 S.W.2d 713, 727 (Tex. 1998) (holding expert testimony unreliable if too great an analytical gap exists between data relied upon and opinion offered).  Dr. Welch does not, however, direct us to any place in the record where a timely objection challenging the reliability of their testimony was made in the trial court.  

The testimony of Drs. Granzotti and Krouse is not speculative on its face.  Thus, to the extent Dr. Welch’s no-evidence complaint requires us to go beyond the face of their testimony to test the reliability of their opinions, it is waived.

We hold that the expert testimony of Drs. Granzotti and Krouse constitutes legally sufficient evidence to support a finding that Delores was suffering from pulmonary emboli when Dr. Welch treated her on April 24, 1996.  
Coastal Transp. Co., 
136 S.W.3d at 233.  We turn now to Dr. Welch’s factual sufficiency challenge.

Factual Insufficiency

Dr. Welch does not advance any additional arguments for why he believes the evidence is factually, as opposed to legally, insufficient.  Instead, he simply contends that 
“[i]f the evidence supporting the existence of emboli is legally insufficient, then it must be factually insufficient when weighed against the record as a whole.” 

In deciding a factual insufficiency issue, we determine whether the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered.  
Garza v. Alviar
, 395 S.W.2d 821, 823 (Tex. 1965).  We are required to consider all of the evidence in the case in making this determination.  
Mar. Overseas Corp., 
971 S.W.2d at 406-07.

Upon a thorough review of the entire record, the only evidence that we find to be contrary to that which proves Delores had pulmonary emboli on April 24, 1996, is the opinion testimony of three doctors—Dr. Welch, Dr. James Cox, and Dr. Godfrey, Delores’s primary care physician—and the underlying data they used in forming their opinions.
(footnote: 6)  The following is a summary of this testimony and underlying data:

Dr. Welch testified that he had considered pulmonary embolus as a possible diagnosis for Delores until part of the way through her treatment and his observation of her on repeat exams.  Because Delores reported feeling “almost normal” after the ventilator treatments, however, Dr. Welch concluded that she was suffering from bronchospasm rather than a pulmonary embolus.  Dr. Welch opined that there was “absolutely no way” Delores could have felt so much better if a pulmonary embolus had caused her symptoms, because the ventilator treatments would not have removed the clot blockage.  

Likewise, Dr. Cox opined that, based on a reasonable medical probability, Delores did not have a pulmonary embolus in April 1996.  Dr. Cox based his opinions on all of Delores’s physical symptoms, her normal x-ray results, and the fact that she began feeling almost normal as a result of the ventilator treatments.  He explained that if Delores had had a pulmonary embolus large enough to cause her low pO
2
 and blood oxygen levels, it would have been “pretty massive”—the size of a fingertip—and that the ventilator treatments would have provided minimal or no improvement because such emboli take weeks to dissolve and often scar the affected artery so that it never has blood flow again.  In addition, Dr. Cox noted that the autopsy findings contained no evidence of pulmonary hypertension or right heart failure—things that would have been present if emboli had repeatedly showered in Delores’s lungs as Drs. Krouse and Granzotti believed. 

Finally, Dr. Godfrey testified that, based on his review of Delores’s medical records, he believed, in reasonable medical probability, that she did not have an embolus “at any point” when he saw her between April 29 and July 3, 1996.  But he acknowledged that had he known of Delores’s low blood oxygen level in the emergency room on April 24, his evaluation of her might have been different because of the catastrophic problems, including pulmonary embolism, that can result from such a low level of oxygenation. 

Like many medical malpractice suits, this case comes down to a “battle of the experts.”  In a battle of competing expert testimony, it is the sole prerogative of the jury to determine the weight and credibility of the witnesses, the obligation of the respective advocates to persuade them, and “our obligation to see that the process was fair and carried out according to the rules.”  
Cruz ex rel.Cruz v. Paso Del Norte Health Found
., 44 S.W.3d 622, 646 (Tex. App.—El Paso 2001, pet. denied) (holding refusal to find nurse negligent not against overwhelming weight of evidence where opinions of experts for both parties conflicted); 
see also Magee v. Ulery,
 993 S.W.2d 332, 336 (Tex. App.—Houston [14
th
 Dist.] 1999, no pet.) (holding failure to find physician negligent not against overwhelming weight of evidence where jury could have believed defense expert that diagnosis was erroneous but not negligent); 
Crawford v. Hope
, 898 S.W.2d 937, 942-43 (Tex. App.—Amarillo 1995, writ denied) (noting “battle of experts” existed in suit against physician for prescribing ineffective medication; weight of evidence was for jury and failure to find proximate cause not manifestly unjust or clearly erroneous).  We cannot substitute our judgment for that of the jury simply because we may disagree with its findings.  
Jones v. Lurie,
 32 S.W.3d 737, 743 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (citing 
Herbert v. Herbert, 
754 S.W.2d 141, 142 (Tex. 1988))
.  
As
 
fact finder, the jury is authorized to disbelieve expert witnesses.  
See
 
Waltrip v. Bilbon Corp., 
38 S.W.2d 873, 882 (Tex. App.—Beaumont 2001, pet. denied).  

Here, the jury believed Simeon’s experts that Delores had pulmonary emboli on April 24, 1996, rather than the experts offered by Dr. Welch who testified to the contrary.
(footnote: 7)  After examining all of the expert testimony and other medical evidence, both for and against the jury’s verdict in this case, we cannot say that the evidence supporting the jury’s finding that Delores was suffering from pulmonary emboli on April 24, 1996 is so weak, or the evidence to the contrary is so overwhelming, that the jury’s verdict should be set aside and a new trial ordered.  
See Garza,
 395 S.W.2d at 823.

Because the evidence is both legally and factually sufficient to sustain the jury’s verdict, we overrule Dr. Welch’s first and second issues.

Jury Argument

In his third issue, Dr. Welch asserts that Simeon’s counsel improperly informed the jury of the effect of its answer to Jury Question No. 2.  Dr. Welch contends that reversal is required because the improper jury argument was incurable by instruction. 

The test for improper jury argument is whether the argument could have persuaded a juror of ordinary intelligence to agree to a verdict contrary to that to which he would have agreed but for the argument.  
Wells v. HCA Health Servs. of Tex., Inc.,
 806 S.W.2d 850, 854 (Tex. App.—Fort Worth 1990, writ denied).  Reversal of a judgment because of jury argument is required only when an evaluation of the entire record shows that argument was improper, uninvited, preserved, and incurable by instruction, withdrawal, or trial court reprimand.  
See Standard Fire Ins. Co. v. Reese,
 584 S.W.2d 835, 839-40 (Tex. 1979); 
Williams v. Lavender,
 797 S.W.2d 410, 413 (Tex. App.—Fort Worth 1990, writ denied).  The party seeking reversal based on an allegedly improper argument must show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence.  
Standard Fire Ins. Co.,
 584 S.W.2d at 840.

In response to Jury Question No. 1, the jury found that the negligence of both Dr. Welch and Dr. Jerome Novotny proximately caused Delores’s death. Question No. 2 asked the jury to apportion the percentage of negligence between Drs. Welch and Novotny.  The jury found Dr. Welch seventy-five percent negligent and Dr. Novotny twenty-five percent negligent. 

Dr. Novotny was the emergency room physician who, in July 1996, allegedly misdiagnosed Delores’s fatal pulmonary embolus as pneumonia.  During closing arguments, Simeon’s counsel initially urged the jury to “put . . . 80/20 in there”—find Drs. Welch and Novotny eighty and twenty percent negligent, respectively, because of Dr. Welch’s initial incorrect diagnosis of asthma that “got them all going off on the wrong thing” and Dr. Novotny’s testimony that eighty percent of his pneumonia diagnosis for Delores was based on her history.  Dr. Welch’s counsel contended in response that only five to ten percent of the liability for Delores’s death should be placed on Dr. Welch. 

In rebuttal, Simeon’s counsel again pointed to Dr. Novotny’s testimony that eighty percent of his diagnosis was based on Delores’s history—in this case, a misstated diagnosis of asthma.  Simeon’s counsel then continued as follows:

Dr. Welch, he caused the trouble for everybody after him.  He told Delores the wrong thing.  She repeated it.  It got in her records.  The doctors went off on it.

You know, the bottom line is, she never had a chance after she left his emergency room, because of him.  Certainly didn’t have much of a chance.

And that’s why, you know, this is very, very, very important.  If you put less than 50 — 51 percent of the blame on Dr. Welch, I guarantee you that they will be dancing out in the hall.

Please, please, whatever you do, put more responsibility and make Dr. Welch accept responsibility.  Put more than half on him, and make him accept responsibility.
  And go by what Dr. Novotny says, 80 percent of it is history. 

Dr. Welch contends that the italicized portion of the above argument warrants a reversal because it informed the jury of the effect of its answer on his joint and several liability for the entire damages award.  
See
 
Tex. Civ. Prac. & Rem. Code Ann.
 § 33.0013(b) (Vernon Supp. 2004-05) (providing that defendant found liable for more than fifty percent of claimant’s damages is both liable for percentage of damages found attributable to him and jointly and severally liable for entire damages award).  He asserts that the argument informed the jury that a finding of less than fifty percent negligence would result in his being either exonerated completely or at least not jointly and severally liable for the entire damages award. 

We do not read the above argument as stating either of these things.  Simeon’s counsel never mentioned joint and several liability or suggested that a fifty percent or less negligence finding would result in Dr. Welch’s exoneration.  Moreover, even assuming for argument’s sake that the argument was improper, Dr. Welch has not shown that the probability that the improper argument caused him harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence.  
See Standard Fire Ins. Co.,
 584 S.W.2d at 840.  Indeed, when taken in context, the complained-of comments could just as easily have been interpreted by the jury as arguing that a finding of more than fifty percent negligence was necessary to send a message to Dr. Welch that he was more responsible for Delores’s death than Dr. Novotny. Accordingly, we hold that the argument does not mandate a reversal.  
See id. 
at 839-40; 
Williams,
 797 S.W.2d at 413.  We overrule Dr. Welch’s third issue.

Batson
 Challenges

In his fourth issue, Dr. Welch complains that the trial court reversibly erred by sustaining Simeon’s 
Batson
(footnote: 8) challenge to two of Dr. Welch’s peremptory strikes, thereby requiring Dr. Welch to accept two objectionable jurors.  Dr. Welch asserts that the trial court’s ruling sustaining the 
Batson
 challenge was improper because the record clearly demonstrated an appropriate, nonracial basis for both strikes. 

Using a peremptory challenge to exclude a juror based on race violates the equal protection rights of the challenged juror.  
Powers v. Palacios,
 813 S.W.2d 489, 490 (Tex. 1991).  Texas courts employ a three-part test when a party raises a 
Batson
 challenge to a peremptory strike:

•the opponent of the peremptory strike must establish a prima facie case of racial discrimination; 

•the burden then shifts to the party who has exercised the strike to come forward with a race-neutral explanation;

•if a race-neutral explanation is offered, the trial court must determine if the party challenging the strike has proven purposeful racial discrimination.

Goode,
 943 S.W.2d at 445.

Where, as here, the party exercising the peremptory strike offered a race-neutral explanation for the strike and the trial court ruled on the ultimate question of intentional discrimination, the preliminary issue of a prima facie case is moot.  
Id.
 
 The issue of whether the race-neutral explanation should be believed is purely a question of fact for the trial court, which may believe or not believe the proffered explanation.  
Id.
 at 445-46.  But the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the peremptory strike.  
Id.
 at 446.

We review a trial court’s ruling on a 
Batson
 challenge under an abuse of discretion standard.  
Id.
  Thus, we will not disturb the ruling unless the trial court acted arbitrarily and unreasonably, without reference to any guiding rules or principles.  
Downer v. Aquamarine Operators, Inc.
, 701 S.W.2d 238, 241-42 (Tex. 1985), 
cert. denied
, 476 U.S. 1159 (1986).  Legal and factual sufficiency are relevant factors in assessing whether the trial court abused its discretion.  
Beaumont Bank, N.A. v. Buller,
 806 S.W.2d 223, 226 (Tex. 1991); 
Tex. Dep’t of Health v. Buckner,
 950 S.W.2d 216, 218 (Tex. App.—Fort Worth 1997, no writ).  An abuse of discretion does not occur, however, when the trial court bases its decision on conflicting evidence, as long as some evidence of substantive and probative character supports the court’s decision.  
Butnaru v. Ford Motor Co.
, 84 S.W.3d 198, 211 (Tex. 2002); 
Davis v. Huey
, 571 S.W.2d 859, 862 (Tex. 1978).  Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar situation does not demonstrate that an abuse of discretion has occurred.  
Downer,
 701 S.W.2d at 241-42.

Because the first prong of the 
Goode 
test is moot in this case, we turn our attention to the second and third prongs of this inquiry.  The record shows as follows:

At the end of voir dire, Dr. Welch peremptorily struck venire members 7 (Franklyn Colon), 22 (Gloria Smith), and 86 (Gwen Jones), all of whom are African-American, thereby removing all African-Americans from the venire panel.
(footnote: 9)  Dr. Welch offered the following explanations in response to Simeon’s 
Batson
 challenge regarding venire members Colon and Smith.
(footnote: 10) He stated that he struck Colon because

[H]e never responded to any questions.  I made several things about avionics, and so forth, and I just never got any response.  So, I ended up with, I don’t know who he is, or what he thinks. 

Simeon pointed out, however, that Colon’s responses on his juror questionnaire showed that he was in the Navy, was a Republican who most admired Colin Powell, and that he would not file suit against a doctor if he were the subject of a medical malpractice lawsuit.  Simeon further argued, “[T]o say that he didn’t answer questions about avionics, when this is a black [R]epublican who doesn’t file lawsuits in malpractice cases, and when [Dr. Welch has] moved to strike all other blacks on the case, I don’t believe he’s articulated a legitimate nondiscriminatory reason, considering the whole of the case.” 

Dr. Welch’s explanation for striking Smith was that she was a paralegal.  Dr. Welch stated that he did not take paralegals on juries due to the “grave risk that they will get into the jury room and start telling folks about legal matters, of what the meaning of legal things is.” 

Regarding this explanation, Simeon pointed out that, although Smith was a paralegal, she worked for a corporation and had stated in front of the entire venire panel during voir dire that she was not involved with litigants or lawsuits and did not have “that type of influence.”  Simeon further noted that Dr. Welch had struck Smith but had objected to striking a white medical malpractice defense attorney for cause.
(footnote: 11)
 Simeon also noted that Smith had checked on her juror questionnaire that she would not sue the doctor if she were the subject of malpractice and had stated the same thing when questioned during voir dire.  In addition, Smith stated on her questionnaire that jury awards were sometimes excessive, that she believed there should be a limit on the amount of money a family could receive when suing a doctor, and that whether mental anguish and punitive damages should be recoverable would depend on the situation.  Simeon argued that all of these factors, when coupled with the fact that Dr. Welch had struck all the African-American venire members, showed that his primary reason for striking Smith was her race. 

Based on this evidence, the trial court could have reasonably disbelieved Dr. Welch’s stated reasons for striking Colon and Smith and found instead that Dr. Welch had struck these jurors based on their race.  
See Goode,
 943 S.W.2d at 443.  Accordingly, we hold that the trial court did not abuse its discretion by sustaining Simeon’s 
Batson
 challenges.  
See id.
 at 446.  We overrule Dr. Welch’s fourth issue.

Exclusion of Dr. Andrea Green’s Testimony.

In his fifth issue, Dr. Welch contends that the trial court abused its discretion by excluding the testimony of one of his experts, Dr. Andrea Green, on the ground that Dr. Green’s testimony would have been cumulative of that of Dr. James Cox, Dr. Welch’s other expert. 

A trial court has the authority to exclude evidence if its probative value is substantially outweighed by the danger of needless presentation of cumulative evidence.  
Tex. R. Evid.
 403.  We review a trial court’s decision to exclude evidence under an abuse of discretion standard and will not reverse the trial court’s ruling absent an abuse of that discretion.  
See Nat’l Liab. & Fire Ins. Co. v. Allen,
 15 S.W.3d 525, 527-28 (Tex. 2000).  We must uphold a trial court's evidentiary ruling if there is any legitimate basis for it.  
Owens-Corning Fiberglas Corp. v. Malone,
 972 S.W.2d 35, 43 (Tex. 1998).  Moreover, we will not reverse based on an erroneous evidentiary ruling unless the error probably caused the rendition of an improper judgment.  
See
 
Tex. R. App. P.
 44.1(a); 
Malone,
 972 S.W.2d at 43.

In this case, Dr. Welch designated Drs. Andrea Green and James Cox, both board certified in emergency medicine, as defense expert witnesses.  After Dr. Cox testified, Simeon moved to exclude Dr. Green’s testimony under rule 403.  Simeon contended that allowing both Drs. Cox and Green to testify would unduly delay the trial with the presentation of cumulative evidence because both experts had similar or identical credentials and had expressed the same opinions during their depositions.  The trial court granted Simeon’s motion and ruled that Dr. Green could not testify. 

Dr. Welch asserts that Dr. Green should have been allowed to testify in addition to Dr. Cox because, “[a]lthough both Drs. Green and Cox would have provided relatively similar (but not identical) testimony on the hotly contested issues in the case, the differences between the doctors themselves is such that testimony from both of them would add substantial weight” to Dr. Welch’s case. 

The record shows, however, that Drs. Green and Cox had similar credentials relevant to their testimony in this case.  Both were board certified in emergency medicine.   In addition, Dr. Cox was on staff in the emergency room department of a large local hospital, and Dr. Green chaired the department of emergency medicine at another large local hospital and practiced emergency medicine there. 

Further, although Dr. Welch contends that Dr. Green’s testimony was not cumulative of Dr. Cox’s, he does not explain how their testimony would have differed.   
In his response to Simeon’s motion to exclude Dr. Green’s testimony, 
Dr. Welch supported his assertion that there “may” be some differences of opinion between Drs. Green and Cox with only a single example of a potential difference.
(footnote: 12)  In addition, although Dr. Welch offered Dr. Green’s curriculum vitae and the transcript of her deposition testimony as a bill of exception when she was not allowed to testify, he did so without specifying any differences between Dr. Green’s and Dr. Cox’s testimony. 

This record demonstrates a legitimate basis—the similarity in opinions and credentials—for the trial court’s exclusion of Dr. Green’s testimony as needlessly cumulative of Dr. Cox’s testimony.  
See Malone,
 972 S.W.2d at 43.  Thus, the record shows that the trial court did not abuse its discretion by excluding the testimony.  
See Downer,
 701 S.W.2d at 241-42.
(footnote: 13)  Indeed, the trial court limited both Dr. Welch and Simeon to only one expert in emergency medicine each and, at Dr. Welch’s request, so informed the jury. 

Finally, due to the similarly in both experts’ credentials and opinions, the record does not show that the exclusion of Dr. Green’s testimony probably caused the rendition of an improper judgment.  
See
 
Tex. R. App. P.
 44.1(a)(1); 
Malone,
 972 S.W.2d at 43.  Accordingly, for all of the foregoing reasons, we overrule Dr. Welch’s fifth issue.

Damages Cap

In his sixth issue, Dr. Welch complains that the trial court improperly refused to apply the noneconomic damages cap of former article 4590i, section 11.02 to the damages award in this case. 

Former article 4590i, section 11.02 (hereafter, section 11.02) provides

(a)  In an action on a health care liability claim where final judgment is rendered against a physician or health care provider, the limit of civil liability for damages of the physician or health care provider shall be limited to an amount not to exceed $500,000.

. . . .

(c)  This section shall not limit the liability of any insurer where facts exist that would enable a party to invoke the common law theory of recovery commonly known in Texas as the “Stowers Doctrine.”
(footnote: 14)
The $500,000 cap is adjustable based on increases and decreases in the consumer price index (CPI).
(footnote: 15)
 In this case, the trial court determined that the value of the $500,000 damages cap was $1,446,895.40, based on a CPI of 177.1.
(footnote: 16)  The trial court refused to apply the damages cap, however, due to its finding “that facts exist that would enable a party to invoke the . . . ‘
Stowers Doctrine.’
”  Instead, the trial court awarded Simeon $5,514,992.87 in actual damages and prejudgment interest
(footnote: 17) against Dr. Welch, plus court costs, postjudgment interest, and ad litem fees.  

Dr. Welch contends that the trial court’s refusal to apply the damages cap was erroneous because it was contrary to the plain language of section 11.02. Dr. Welch asserts that section 11.02(c) does not lift the damages cap as to him, but merely provides that his insurer’s liability is not limited by the damages cap if facts exist that would enable him to invoke the 
Stowers
 doctrine.
(footnote: 18) Simeon, on the other hand, contends that the trial court’s refusal to apply the damages cap was proper because the cap does not apply to a physician’s liability when facts exist that would enable a party to invoke the 
Stowers
 doctrine.  Simeon asserts that such facts exist in this case because Dr. Welch’s insurer refused Simeon’s 
Stowers
 demand, in which he offered to settle his claims against Dr. Welch for the $1 million limits of Dr. Welch’s insurance policy, and the jury returned a verdict against Dr. Welch for substantially more than policy limits.

Statutory construction is a question of law; therefore,
 we review the trial court’s decision de novo.  
Tex. Dep’t of Transp. v. Needham,
 82 S.W.3d 314, 318 (Tex. 2002)
.  
In construing a statute, we must determine and give effect to the legislature’s intent, considering the statute as a whole and not its provisions in isolation
.  
Continental Cas. Co. v. Downs,
 81 S.W.3d 803, 805 (Tex. 2002)
; 
Nat’l Liab. Fire Ins. Co.,
 15 S.W.3d at 527
.
  Unless a statute is ambiguous, we discern that intent from the language of the statute itself.  
Continental Cas. Co.,
 81 S.W.3d at 805.

We first look to the statute’s plain and common meaning and presume that the legislature intended the plain meaning of its words.  
Fleming Foods of Tex., Inc. v. Rylander,
 6 S.W.3d 278, 282, 284 (Tex. 1999); 
see also
 
Tex. Gov’t Code Ann. 
§ 311.011(a) (Vernon 2005) (providing that words and phrases shall be read in context and construed according to the rules of grammar and common usage)
.  If possible, we must ascertain the legislature’s intent from the language it used in the statute and not look to extraneous matters for an intent the statute does not state.  
Allen,
 15 S.W.3d at 527.

In applying the plain and common meaning of the language in a statute, courts may not by implication enlarge the meaning of any word in the statute beyond its ordinary meaning; such implication is inappropriate when legislative intent may be gathered from a reasonable interpretation of the statute as it is written.

Sorokolit v. Rhodes,
 
889 S.W.2d 239, 241 (Tex. 1994).

“[W]e cannot be blind to the plain language” of a statute.  
Republicbank Dallas, N.A. v. Interkal, Inc.,
 691 S.W.2d 605, 607 (Tex. 1985).
  “
It is imperative that the citizens of this State be able to rely on the plain meaning of our laws to determine their rights and responsibilities.”
  
Fleming Foods
,
 6 S.W.3d at 286.

Looking to the plain and common meaning of the words used in section 11.02, and presuming that the legislature intended the plain meaning of those words, we hold that section 11.02(a) limits Dr. Welch’s liability for Simeon’s noneconomic damages to $500,000, as adjusted by the CPI, and that section 11.02(c) applies only to insurers and does not lift the damages cap applicable to physicians.  To construe former section 11.02(c) to apply to physicians, as Simeon urges and as the trial court did in this case, would improperly enlarge the meaning of the phrase, “[t]his section shall not limit the liability of any 
insurer,
” beyond its ordinary meaning.  
See Sorokolit,
 889 S.W.2d at 241.  The word “insurer” does not, in its ordinary sense, include a physician.  
See
 
Merriam Webster’s Collegiate Dictionary
 607 (10th ed. 1994) (defining “insurer” as “one that insures; specif[ically]:  an insurance underwriter”).  Moreover, such a construction would be inappropriate when the legislature’s intent to apply section 11.02(c) only to insurers can be easily understood from a reasonable interpretation of the statute as written.  
See Sorokolit,
 889 S.W.2d at 241.

Likewise, the plain meaning of other terms used in section 11.02(a) shows that the legislature did not intend section 11.02(c) to affect the damages cap.  For instance, section 11.02(a)’s damages cap applies only to physicians and health care providers and only “[i]n an action on a health care liability claim.”
(footnote: 19)  By statutory definition, a health care liability claim can only be asserted against a physician or health care provider; it cannot be asserted against an insurer.
(footnote: 20)  Therefore, an insurer cannot be liable to an injured patient under former article 4590i, and section 11.02(c)’s provision that an insurer’s liability is not limited is not—and cannot be—a reference to a health care liability claim.  Instead, the insurer’s liability referred to in section 11.02(c) can only be the insurer’s 
Stowers
 liability to the insured physician.  
See Hernandez v. Great Am. Ins. Co. of N.Y.,
 464 S.W.2d 91, 94 (Tex. 1971) (stating that tort of insurer in mismanaging insured’s defense is harmful to insured alone); 
Wheelways Ins. Co. v. Hodges,
 872 S.W.2d 776, 782 (Tex. App.—Texarkana 1994, no writ); 
Whatley v. City of Dallas,
 758 S.W.2d 301, 307 (Tex. App.—Dallas 1988, writ denied) (both holding that 
Stowers
 claim that insurer negligently failed to settle injured party’s suit against insured belongs to insured).
(footnote: 21)
 Further, the legislative history supports our construction of this statute.  An early House version of bill 1048, which became former article 4590i, provided that a 
physician’s or health care provider’s
 civil liability would not be limited where facts exist that would enable a party to invoke the 
Stowers
 doctrine.
(footnote: 22)  While this version of bill 1048 would support Simeon’s position, it was not enacted into law.  Instead, after testimony and debate on the matter, the legislature enacted the Senate version of bill 1048, which provided that an 
insurer’s
 liability—rather than a physician’s or health care provider’s—was not limited in those circumstances.
(footnote: 23)  Former 4590i, section 11.02, is taken verbatim from the Senate version of bill 1048.
(footnote: 24)  This final version of the statute that the legislature enacted addresses concerns raised during floor debate in the House about how to limit physicians’ liability while at the same time encouraging insurers to settle.
(footnote: 25)
 We are unpersuaded by Simeon’s argument that the damages cap must be lifted as to physicians in order to provide a large enough “stick” or “carrot” to induce insurance companies to enter into settlement negotiations in good faith.  This argument is premised primarily on a letter from Senator Schwartz, one of the bill’s cosponsors—written over twenty years after the enactment of former article 4590i—and a law review article that relies heavily on Senator Schwartz’s letter.
(footnote: 26)  “[C]ourts construing statutory language should give little weight to post-enactment statements by legislators. Explanations produced, after the fact, by individual legislators are not statutory history, and can provide little guidance as to what the legislature collectively intended.”  
In re Doe,
 19 S.W.3d 346, 352 (Tex. 2000) (quoting 
C & H Nationwide, Inc. v. Thompson,
 903 S.W.2d 315, 329 (Tex. 1994) (Hecht, J., concurring & dissenting) (citations omitted)).
(footnote: 27)  

The problem with postenactment statements is that they were not available to other legislators at the time they considered the bill in question and therefore could not have influenced the legislative process that produced the statute.  Lisa R. Eskow, 
Obtaining & Using Tex. Legislative History, in
 
Univ. of Tex. 12th Annual Conf. on State & Fed. Appeals
 10 (2002).  Nor is there an opportunity for other legislators to respond to postenactment statements prior to a vote.  
Id.
  Moreover, we cannot rely on Senator Schwartz’s letter for an intent that the plain language of section 11.02(c) does not state.  
See Allen,
 15 S.W.3d at 527.

Further, in this case, even after the damages cap is applied, Dr. Welch’s insurer is potentially liable to him in a subsequent 
Stowers
 action for (1) the $446,895.40 amount by which the adjusted damages cap exceeds Dr. Welch’s policy limits, (2) court costs, (3) postjudgment interest, and (4) ad litem fees—a total amount that is significantly more than the insurer would have been required to pay if it had accepted Simeon’s settlement offer for policy limits.  Although this is not the millions for which the insurer would potentially be liable if the damages cap were lifted as to Dr. Welch, we believe it is sufficient to encourage insurers to engage in good faith settlement negotiations.

We are also unpersuaded by Simeon’s argument that our construction of section 11.02(c) will change the law by limiting an insurer’s liability in a 
Stowers
 action.
(footnote: 28)  
Stowers
 liability is to the insured for the damages the insured has suffered as a result of the insurer’s negligent failure to settle.  
See Hernandez,
 464 S.W.2d at 95; 
Becker v. Allstate Ins. Co.,
 678 S.W.2d 561, 561 (Tex. App.—Houston [14th Dist.] 1984, writ ref’d n.r.e.).  Our holding does not change this principle; it simply limits the amount of the insured’s 
Stowers
 damages.

Finally, although the trial court found that facts exist that would give rise to a 
Stowers
 claim, such a finding does not establish Dr. Welch’s insurer’s 
Stowers
 liability; he must still prove that his insurer was negligent in failing to accept Simeon’s 
Stowers
 demand.  
See Garcia,
 876 S.W.2d at 848.  Thus, Simeon’s construction of section 11.02(c) could result in a physician such as Welch, if he is unsuccessful in a 
Stowers
 action, having to bear permanently the burden of a judgment far in excess of the damages cap.  We do not believe the legislature intended such an absurd result,
(footnote: 29) particularly in situations where the physician may be willing to settle for policy limits but his insurer is not.
(footnote: 30)
 For all of the foregoing reasons, we hold that section 11.02(c) does not lift the damages cap of section 11.02(a) as to physicians.  Accordingly, the trial court erred by refusing to apply the damages cap to the jury’s verdict in this case.  We sustain Dr. Welch’s arguments in his sixth issue regarding the damages cap.

Capping of Prejudgment Interest

Next, Dr. Welch contends that the prejudgment interest awarded in the judgment is subject to the damages cap.  We agree.

The trial court ruled that prejudgment interest on actual damages is not capped, even if the damages are, and awarded Simeon prejudgment interest on the capped actual damages in the event this court determined that the damages cap applied to Dr. Welch’s liability.  The supreme court has held, however, that prejudgment interest on noneconomic damages is subject to section 11.02(a)’s damages cap because prejudgment interest is a form of compensatory damages.  
See Columbia Hosp. Corp. of Houston v. Moore,
 92 S.W.3d 470, 474-75 (Tex. 2002).  In this case, the jury found that Simeon suffered actual past and future noneconomic damages of $5,154,000 and that Dr. Welch was liable for seventy-five percent of those damages, or $3,865,000.  This amount, which does not include prejudgment interest, exceeds
 the damages cap. 
 Accordingly, the trial court erred by awarding Simeon prejudgment interest in addition to the capped damages.  We sustain this portion of Simeon’s sixth issue.

Settlement Credit

Finally, Dr. Welch argues that he is entitled to credit against the $1,446,895.40 capped damages of $655,993, the total dollar amount of settlements between Simeon and Dr. Welch’s codefendants.  As support for this argument, Dr. Welch relies on civil practice and remedies code section 33.012, which provides,

If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a credit equal to one of the following, elected in accordance with Section 33.014:

(1)  the sum of the dollar amounts of all settlements[. . . .]
(footnote: 31)
 Dr. Welch contends that “the amount of damages to be recovered” by Simeon in this case under section 33.012 is limited to the capped damages amount for which Dr. Welch is liable.  We disagree.  Section 33.012 clearly provides that the settlement credit is to be applied to the amount of damages to be recovered by the plaintiff in the entire cause of action, not merely to the damages recoverable against a single codefendant.

Section 11.02(a)’s damages cap is calculated on a per defendant basis; it applies to the recovery against an individual physician or health care provider defendant, not to the award to the individual plaintiff.  
Rose v. Doctors Hosp.,
 801 S.W.2d 841, 847 (Tex. 1990).  Thus, plaintiffs who recover against more than one defendant may obtain a judgment in excess of the damages cap as long as the combined statutory liability of all defendants is not exceeded.  
Id.
 

In this case, the jury found that both Drs. Welch and Novotny were liable to Simeon for Delores’s death.  Therefore, although Simeon could not recover more than the capped amount of $1,446,895.40 from Dr. Welch, he was also entitled to recover up to the amount of the cap from Dr. Novotny.  
See id.
 (holding that plaintiff was entitled to judgment for up to amount of capped damages multiplied by number of defendants found liable to plaintiff); 
Wynn v. Cohen,
 864 S.W.2d 205, 206-07 (Tex. App.—Houston [14th Dist.] 1993, writ denied) (holding that 
Rose’s
 “multiplication theory” applied to damages subject to settlement credit under section 33.012).  The jury found that Simeon suffered actual past and future damages of $5,154,000 and that Dr. Novotny was liable for twenty-five percent of those damages, or $1,288,500. Accordingly, had Simeon not settled with Dr. Novotny, he would have been entitled to recover $2,735,395.40 in actual damages with respect to his medical negligence cause of action.
(footnote: 32)  It is from this amount, not merely the capped damages for with Dr. Welch is liable, that the settlement credit should have been deducted.

A deduction of the $655,993
(footnote: 33) claimed settlement credit from $2,735,935.40 would not have affected the capped damages as to Dr. Welch.  Therefore, the trial court did not err by failing to deduct the settlement credit from Dr. Welch’s portion of the capped damages.  We overrule Dr. Welch’s argument in his sixth issue regarding the settlement credit.

Conclusion

Having sustained Dr. Welch’s sixth issue in part, we hold that the noneconomic damages cap of the Medical Liability and Insurance Improvement Act applies to the jury’s damages award and that the maximum amount Simeon can recover from Dr. Welch is $1,446,895.40.  Accordingly, we reverse the trial court’s judgment awarding Simeon the entire damages award and, using the trial court’s calculations in its judgment,
(footnote: 34) render judgment awarding damages based on the damages cap as follows:

•To Simeon individually, $140,366.21;

•To Simeon as heir to the Estate of Delores McLean, $43,232.80;

•To Simeon as next friend of Jamila Imari McLean, $631,648.11;

•To Simeon as next friend of Imani Zakiya McLean, $631,648.11.

We further render judgment that Simeon is not entitled to any prejudgment interest on these amounts, but is entitled to postjudgment interest, court costs, and ad litem fees as awarded in the trial court’s judgment.

JOHN CAYCE

CHIEF JUSTICE

PANEL A: CAYCE, C.J.; HOLMAN and GARDNER, JJ.

DELIVERED: June 2, 2005

FOOTNOTES
1:
McLean sued in his individual capacity, as heir to the estate of Delores McLean, deceased, and as next friend of Jamila Imari McLean and Imani Zakiya McLean, minors.  For simplicity, we refer to him in all these capacities as “Simeon.”

2:
A pulse oximeter is a small device that clips on a finger or other extremity and estimates a person’s blood oxygen saturation—the amount of oxygen being carried by arterial blood.  A blood gas test is a blood test that directly measures the partial pressure oxygen (pO
2
) and carbon dioxide (pCO
2
) in arterial blood.  It is a more accurate test than pulse oximetry. 

3:
Dyspnea is awareness of the sensation of breathing, or shortness of breath, and hypoxemia is deficient oxygenation of the blood.  Bronchospasm is a decrease in the diameter of the airway, due to either internal spasm or swelling.  

4:
Four to six weeks before Delores’s death was 
May 29 to June 12
.

5:
These symptoms included a low pO
2
 level of 56, a low-normal pCO
2
 level of 33, a widened A-a gradient (the gradient between the oxygen pressures in the alveoli and the arteries), a low oxygen saturation level, shortness of breath, and a rapid pulse rate. 

6:
Another of Dr. Welch’s experts, Dr. Dudley Davenport Jones, opined that, while there was evidence of “prior” thromboembolism to Delores’s small blood vessels, it could not be determined “with any precision” whether the microscopic emboli found in Delores’s lung tissue after her death were there a month or two-and-a-half months before her death.  According to Dr. Jones, “[i]t could be either way.” 
 Because this equivocal opinion testimony does not tend to disprove that Delores had pulmonary emboli on April 24, 1996, we do not consider it to be contrary to the finding at issue.

7:
In our original opinion, we reasoned that Dr. Krouse was prohibited from stacking inferences to reach his opinion that emboli were showering in Delores’s lungs on April 24, 1996.  
Welch v. McLean
, No.02-02-00237-CV, 2004 WL 595042, at *9 (Tex. App.—Fort Worth, March 25, 2004, no pet. h.); 
see 
Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,
 435 S.W.2d 854, 858 (Tex. 1968) (holding that
 party may not establish a vital fact by stacking one inference upon another).  
Thus, we held that the evidence supporting the verdict was too weak to be factually sufficient. 
 
Welch,
 2004 WL 595042, at *9. In his motion for rehearing
, however, Simeon correctly points out that the opinions of medical experts are an exception to the rule against inference stacking.
  
See Tex. Empl. Ins. Ass'n v. Talmadge,
 256 S.W.2d 945, 951-52 (Tex. Civ. App.—Beaumont 1953, writ ref’d n.r.e.); 
S. Underwriters v. Hoopes,
 120 S.W.2d 924, 926 (Tex. Civ. App.—Galveston 1938, writ dism’d) (both holding that medical expert testimony is exception to inference stacking rule); 
see also White v. Presnall,
 No. 05-93-01029-CV, 1994 WL 416724, at *6 (Tex. App.—Dallas, Aug. 10, 1994, writ denied) (not designated for publication) (holding application of prohibition against inference stacking to medical expert testimony “untenable” because courts are incapable of assessing relationship between direct and inferred facts established by such testimony)
.

8:
Batson v. Kentucky,
 476 U.S. 79, 106 S. Ct. 1712 (1986).  
In 
Batson,
 the Supreme Court held that a criminal defendant is denied equal protection under the United States Constitution if a prosecutor uses peremptory challenges to exclude members of the jury panel solely on the basis that their race is the same as the defendant's.  
Id.
 at 88-89, 106 S. Ct. at 1718-19.  
Batson’s
 reach has been extended to civil trials.  
Goode v. Shoukfeh,
 943 S.W.2d 441, 444 (Tex. 1997).

9:
Simeon and his family are African-American. 

10:
The trial court denied Simeon’s 
Batson
 challenge to Jones, and Simeon has not appealed that ruling.  Therefore, we do not discuss Dr. Welch’s reasons for striking Jones.  After the trial court sustained Simeon’s 
Batson
 challenges to Colon and Smith, they were seated on the jury. 

11:
Dr. Welch contended that he had not objected to the trial court’s discharge for cause of the white attorney—who was or had been opposing counsel against Simeon’s attorney in at least two cases.  The record shows that Dr. Welch objected initially when the trial judge said, “I think we need to let him go.”  Dr. Welch did not ultimately object to the attorney being discharged for cause—but only after the attorney was questioned extensively and stated repeatedly that he was concerned that his work as a defense attorney carried with it “an inherent potential for bias or some concern for that.” 

12:
Dr. Welch quoted the following alleged excerpt from Dr. Cox’s deposition testimony as evidence that his and Dr. Green’s opinions “may” differ:

Q.  Okay.  Do you agree with Andrea Green, Dr. Welch’s emergency room expert, that Delorse McLean, quote, had obesity and the use of birth control pills as risk factors?  Do you agree with the statement as is?

A.  As is, no. 

Absent further elaboration by Dr. Cox, we do not read this response as indicating his disagreement with Dr. Green’s testimony.

13:
Dr. Welch’s authorities are inapposite because they involved witnesses whose relationship with a party or whose interest in the outcome of the case diminished their credibility.  
See Sims v. Brackett,
 885 S.W.2d 450, 454 (Tex. App.—Corpus Christi 1994, writ denied) (holding, in case where plaintiff’s first expert was plaintiff’s friend, that second expert should have been allowed to testify because his more specialized credentials and lack of personal relationship with plaintiff would have made him more credible than first expert); 
Bohmfalk v. Linwood,
 742 S.W.2d 518, 521 (Tex. App.—Dallas 1987, no writ) (holding that trial court improperly excluded testimony of disinterested witness whose testimony corroborated testimony of interested witness).  Although Dr. Cox was once on the hospital’s emergency room staff, he had left there at least fifteen years before testifying at trial, and there is no evidence that his past association with the hospital damaged his credibility with the jury.

14:
Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 11.02(a), (c), 1977 Tex. Gen. Laws 2039, 2052 (repealed 2003) (current version at 
Tex. Civ. Prac. & Rem. Code Ann.
 § 74.303(a), (d) (Vernon 2005)).  The $500,000 damages cap does not apply to damages awarded for past and future medical, hospital, and custodial care.  
Id.
 § 11.02(b).

15:
Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 11.04, 1977 Tex. Gen. Laws 2039, 2053 (repealed 2003) (current version at 
Tex. Civ. Prac. & Rem. Code Ann.
 § 74.303(b) (Vernon 2005)).

16:
Dr. Welch argues that a slightly lower CPI of 172.9 for December 2001 applies, resulting in a capped value of $1,398,850, and he asks us to take judicial notice of these figures.  We decline to do so because Dr. Welch has not supplied documentation showing what the CPI was in December 2001, nor has he explained why the December 2001 CPI should apply to the trial court’s judgment, which was rendered on April 12, 2002.   
See
 
Tex. R. Evid.
 201(d).

17:
This amount was awarded to Simeon individually, as heir to Delores’s estate, and in his capacity as next friend for Jamila and Imani. 

18:
The 
Stowers
 doctrine has its origins in the case of 
G.A. Stowers Furniture Co. v. Am. Indem. Co.,
 15 S.W.2d 544  (Tex. Comm. App. 1929, holdings approved).  Under this doctrine, an insurer is required to exercise “that degree of care and diligence which an ordinarily prudent person would exercise in the management of his own business” in responding to settlement demands within policy limits.  
Id.
 at 547.  The 
Stowers
 duty is activated by a settlement demand if three prerequisites are met:  (1) the claim against the insured is within the scope of coverage; (2) the settlement demand is within the policy limits; and (3) the terms of the demand are such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to an excess judgment.  
Am. Physicians Ins. Exch. v. Garcia,
 876 S.W.2d 842, 848-49 (Tex. 1994).

19:
See
 Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 11.02(a), 1977 Tex. Gen. Laws 2039, 2052.

20:
See
 Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.03(4), 1977 Tex. Gen. Laws 2039, 2041 (limiting a health care liability claim to “a cause of action against a health care provider or physician”) (current version at 
Tex. Civ. Prac. & Rem. Code Ann.
 § 74.001(13) (Vernon 2005)).  When a term is statutorily defined, we 
are bound to construe the term by its statutory definition.  
Tex. Gov’t Code Ann. 
§ 311.011(b)
 (Vernon 2005); 
Needham,
 82 S.W.3d at 318; 
Transp. Ins. Co. v. Faircloth,
 898 S.W.2d 269, 274 (Tex. 1995).

21:
Simeon’s construction of sections 11.02(a) and (c) is inconsistent.  He agrees that section 11.02(a)’s damages cap applies only to health care liability claims because that is what the plain language of section 11.02(a) says.  But he contends nonetheless that section 11.02(c) applies to physicians even though the plain language of section 11.02(c) does not mention them.  Simeon further contends that the purpose of former article 4590i is to limit liability insurers’ payments for health care liability claims “except in a 
Stowers
 situation.”  This purpose is not, however, listed in the statute.  Instead, the Act’s stated purposes include decreasing the cost of health care liability claims “in a manner that will not unduly restrict claimants’ rights” and making liability insurance available to physicians at reasonably affordable rates—all in order to alleviate the medical malpractice insurance crises in Texas and its concomitant adverse effects on the availability of medical care.  
See
 Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.02(a)(4)-(5), (b)(2)-(4), 1977 Tex. Gen. Laws 2039, 2040.

22:
That version of H.B. 1048 provided as follows:

LIMIT ON CIVIL LIABILITY.  In an action on a health care liability claim where final judgment is rendered against a physician or health care provider, the limit of civil liability for damages of the physician or health care provider shall be limited to an amount not to exceed $500,000.  
This section shall not limit the liability
 where facts exist that would enable a party to invoke the common law theory of recovery commonly known in Texas as the “Stowers’ Doctrine.” 

House Comm. on State Affairs, Bill Analysis,
 Tex. H.B. 1048, 65th Leg., R.S. (1977) (emphasis supplied). 

23:
During testimony regarding bill 1048 before the Senate Committee on  Jurisprudence, Mr. Ace Pickens, representing the Texas Medical Association, stated,

There is one thing that I hope you will consider and that is a section in the bill that relates to the Stowers doctrine of which I am sure you are familiar with [sic].  It’s always been my understanding that the Stowers Doctrine applied to insurers and not to the defendants.  I believe that they have perhaps created another cause of action in this bill because they made the so-called Stowers Doctrine apply to insurer, physician, or health care provider, and I would hope that you would take out the word physician or health care provider and just leave the Stowers doctrine applying to the insurance company where it always has been heretofore.

Texas Medical Liability Insurance Improvement Act of 1977:  Hearings on Tex. S.B. 1048 Before Senate Comm. on Jurisprudence,
 65th Leg., R.S. (March 29, 1977) (statement of Mr. Ace Pickens) (transcript available from Legislative Intent Research, Austin, Texas). 

In the Conference Committee’s side-by-side comparison of bill 1048, the description of the House version states, in pertinent part:  “applies Stowers Doctrine to ‘insurers, physicians, or health care providers.’”  The description of the Senate version states, “applies Stowers Doctrine to ‘insurers’ only.”  The bill comparison then states that the Senate version has been accepted.  
See
 
Conf. Comm. Report, Side-By-Side Analysis
, S.B. & H.B. 1048, 65th Leg., R.S. (1977). 

24:
See
 
Senate Comm. on Jurisprudence Report,
 Tex. S.B. 1048, 65th Leg., R.S. (1977).
 

25:
During debate in the House Committee on State Affairs regarding H.B. 1048, the following exchange occurred:

REP. UHER:  [W]hen you have a claim, of course, we go into this notice and negotiation.  At that point is when the company is going to become involved—I’m talking about your insurance—I’m talking about the doctor’s insurance protector—becomes involved in this negotiations, and they must bargain in good faith.  That’s in the bill.

REP. HOESTENBACH:  But is there any—I mean—you can’t some teeth [sic] to make them stick by the rules just like the lawyers have to stick by the rules?

. . . .

REP. HENDERSON:  [W]e have an old theory of law that’s called the Stowers Doctrine.  And what it says is, is that if you do bargain in good faith—and this is a loose definition—but this is the essense of it—if you don’t bargain in good faith, you try to hide behind the ball, then you’re—then you have no limits on your liability.  So the Stowers Doctrine is in here, and this will be an incentive for all parties to participate in good faith.  And this kind of answers, I think, what you’re talking about Mr. Hoestenbach.

Debate on Tex. H.B. 1048 in the House Committee on State Affairs, 65th Leg., R.S. 10-12 (Mar. 14, 1977). 

26:
See 
Letter from former Senator A.R. “Babe” Schwartz to “To Whom It May Concern” (Nov. 25, 1998); 
see also
 Mark D. Clore, 
Medical Malpractice Death Actions:  Understanding Caps, Stowers, and Credits,
 41 
S. Tex. L. Rev.
 467, 494-98 (2000).  Senator Schwartz’s letter states in pertinent part as follows:

In my opinion, the Legislature used a “carrot and stick” approach.  Section 11.02 establishes an incentive for all parties to bargain in good faith and resolve many of these claims.  Section 11.02 was intended to strongly warn parties and insurers who refused to bargain, and move in good faith towards settlement, that they would not benefit from such conduct.

The “carrot” for a health care provider/physician/insurer and the “stick” for a claimant is found in Subsection (a), the damage cap of $500,000.00 on final judgments.  The purpose of setting an insurer’s limits of exposure and a claimant’s maximum amount of recovery on a final judgment at $500,000.00 was again meant to facilitate settlement offers within the insurance policy limits of the health care provider/physician.

The “stick” for health care provider/physician/insurer and the “carrot” for a claimant is found in Subsection (c).  It incorporates the common law Stowers Doctrine into the statute.  The purpose of this language is to provide that an insurer’s limit of exposure and a claimant’s maximum recovery will be the full amount of any verdict in the event an insurer fails to accept a reasonable settlement demand within the policy limits of the health care provider/physician.

27:
We also decline Simeon’s invitation to consider various trial court judgments and civil practice and remedies code section 74.303, which the legislature enacted in 2003 to replace section 11.02.  
See
 
Tex. Civ. Prac. & Rem. Code Ann.
 § 74.303.  Neither of these sources is listed in the government code as a statutory construction aid, and we fail to see how either could provide insight into the legislature’s intent decades earlier in enacting section 11.02.  
See
 
Tex. Gov’t Code Ann.
 § 311.023 (Vernon 2005); 
see also
 
Lee v. Mitchell,
 23 S.W.3d 209, 213 (Tex. App.—Dallas 2000, pet. denied) (stating that legislative history includes the enactment 
history
 of a statute).

28:
See, e.g.,
 
Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.02(b)(7), 1977 Tex. Gen. Laws 2039, 2041 (providing that former article 4590i was intended to modify liability laws only as they relate to 
health care liability claims and not as to other areas of the Texas legal system or tort law)

29:
See Barshop v. Medina County Underground Water Conserv. Dist.,
 925 S.W.2d 618, 629 (Tex. 1996) (holding that courts should not read a statute to create an absurd result).

30:
For example, Simeon asserts that Dr. Welch was willing to settle in this case, even though his insurer was not. 

31:
Act of May 8, 1995, 74th Leg., R.S., ch. 136, § 1, sec. 33.012(b), 1995 Tex. Gen. Laws 971, 974 (amended 2003) (current version at 
Tex. Civ. Prac. & Rem. Code Ann.
 § 33.012(c) (Vernon Supp. 2004-05)) [hereafter, “section 33.012"].

32:
See
 
Act of May 8, 1995, 74th Leg., R.S., ch. 136, § 1, sec. 33.012(b), 1995 Tex. Gen. Laws 971, 974
.

33:
The trial court applied a settlement credit of only $615,000 to the judgment, but the difference between the two numbers is irrelevant to our determination of this issue because neither amount would have affected Dr. Welch’s liability for the capped damages.

34:
The trial court’s judgment for $5,514,992.87, represented the entire damages award plus prejudgment interest, less $615,000 in settlement credits. The court, however, also calculated the amount of damages Simeon would recover in each of his capacities if a reviewing court determined, as we have, that the damages cap applied.