COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-05-401-CV

 

 

RICHMOND CONDOMINIUMS                                                 APPELLANT

 

                                                   V.

 

SKIPWORTH COMMERCIAL 

PLUMBING, INC.                                                                    APPELLEE

 

                                              ------------

 

             FROM
THE 89TH DISTRICT COURT OF WICHITA COUNTY

 

                                              ------------

 

                                OPINION
ON REHEARING

 

                                              ------------

After considering our prior
opinion on appellant=s motion for
rehearing, we deny the motion, but we withdraw our opinion and judgment dated
July 26, 2007, and substitute the following.

I.  Introduction








In four issues, Appellant
Richmond Condominiums asserts that (1) the jury verdict finding that Skipworth
Commercial Plumbing, Inc. (ASkipworth@) was not
negligent in causing the fire at issue is against the great weight and
preponderance of the evidence presented, (2) the court erred by failing to
sanction or otherwise discipline counsel for Skipworth for his ex parte
communication with members of the Richmond Condominiums joint venture during
the pendency of the litigation, (3) the court committed reversible error in
admitting speculative testimony from nonexperts in violation of the court=s limine order and over the objection of counsel for Richmond
Condominiums and in forcing Richmond Condominiums to present evidence of its
insurance through Western Heritage Insurance Company to the jury, and (4)
counsel for Skipworth made improper jury arguments during his closing argument
that were so prejudicial and inflammatory that they were incurable and constitute
reversible error.  We affirm.  

II.  Factual and Procedural Background

This is the case of Awho started the fire?@  The suit arose from a fire
that occurred on March 3, 2002, at the Richmond Condominiums in Wichita Falls,
Texas.  On the site that day were
plumbers employed by Skipworth who were Asweating@ copper
pipes with open flame torches for the eventual installation of kitchen and
bathroom fixtures in the living units on the west side of the large,
multi-story building.

 

 








A.  The Richmond Condominiums Project

Randle Forcher (AForcher@) purchased
the property at issue for $100,000 and began the project with the financial
assistance of his son-in-law, Randy Wachsman (AWachsman@).  However, Wachsman ultimately did not wish to
finance the project (which later became known as ARichmond Condominiums@) by himself and arranged to bring in other investors.  Richmond Condominiums eventually became a
joint venture with Forcher, Larry Scott (AScott@), Steve
Priester (APriester@), Scott Skipworth, and Wachsman (collectively the Ajoint venturers@).

Forcher provided the project=s day-to-day oversight and acted as the project foreman, keeping a
regular Aeye on things.@  Forcher had complete control over the
execution of the Atrade=s@ work at the
job site.  By the time of the fire at
issue, the project was 60% to 70% complete and more than $178,000 had already
been expended in excess of the construction loan, while no units had been sold
or leased.

The building at issue had
previously caught fire.  During the
renovation, Forcher hired Atransients@ from the
nearby mission to do odd jobs, but it became necessary for Forcher to let some
of them go.  Also, the project
experienced multiple break-ins and thefts.








Following the March 2002 fire,
the joint venture made a claim on its fire insurance policy with Western
Heritage Insurance Company (AWestern Heritage@), which
paid $938,189.72 and was subrogated to the joint venture=s rights against Skipworth and any other potential tortfeasors.  Western Heritage then filed suit against
Skipworth in the name of its subrogor, Richmond Condominiums.[1]

B.  The Day of the Fire

On the date of the fire, the
east side of the building was largely complete, while the west side was still
in the Arough-out@ phase.  The people known to be present in the
building on the day of the fire included two Skipworth employees, John Neal (ANeal@) and Philip
Henderson (AHenderson@), Forcher and his helper, Steve Humphries (AHumphries@),
electrical contractors A-Bar Electric (with whom Richmond Condominiums
settled), and possibly the painters, Ramon=s Painting.[2]  While most people present in the building on
the day of the fire were working on the east side, they took trash out and
entered and exited the building through the west side where the fire occurred.








The trial testimony indicated
that Skipworth employees were the only people working on the west side of the
building on the day of the fire, and on that day, Neal and Henderson were
installing or Asweating@ copper pipes.  Neal is a
licensed journeyman plumber.  At some
point, Henderson dropped his pipe cutter down an opening into the
basement.  At approximately 4:30 p.m.,
Neal and Henderson completed their work for the day, then spent ten to fifteen
minutes in the immediate area collecting their tools and looking around to
ensure that no risk of fire was present. 
They then proceeded to the basement to retrieve Henderson=s pipe cutter and discuss the next day=s work, spending approximately thirty to forty minutes in the basement
on the west side.  Neal then returned to
the area in which he had been working that day to look around and ensure that
the area was safe and clean and that there was no danger of fire. In all,
Skipworth=s employees
spent at least fifty minutes to an hour in the building after completing their
actual work on the day in question.  At
no time did the Skipworth employees testify that they noticed anything unusual
or any risk of fire.

Neal testified that he was
careful to avoid scorching the wood wall studs around which he was
working.  Forcher, who was present
throughout and oversaw Skipworth=s work, never mentioned or suggested that Skipworth had scorched or
caused fire damage to the wood studs. 
The investigating authorities were not made aware of any evidence
Skipworth ever scorched or burned a wall stud during its operations on the
project.








However, the pipes Skipworth
was sweating were located in close proximity to the wooden structural members
of the building.  The wooden members were
quite old and dry, the building having been constructed in the 1920s.  Despite this proximity, Skipworth did not use
an asbestos blanket or other flame retardant material to protect the wood from
the effects of the torches, and the Skipworth employees were the last to leave
that day.  There was no evidence of
anyone else in the building between their leaving and the time of the fire.

Neal further testified that
they were generally working within six to eight inches of the wooden structural
members of the building during their pipe sweating operations.  Neal stated that the fire code requires that,
when working in close proximity to anything combustible, a Ashield@ or a Ablanket@ should be
used to protect the wood from fire and ensure safety of the operation.  Neal also admitted that no Ashield@ or Ablanket@ was used,
although he understood the requirement and its purpose.  Skipworth=s Afire watch@ consisted of Neal=s packing up tools and going down to the basement to search for a lost
tool.








The building itself contained
a newly installed fire suppression system that had been tested by the Wichita
Falls Fire Marshal and approved for operation but was turned off on the day of
the fire.  There were at least two
cigarette smokers present in the buildingCForcher and Humphries. 
Flammable hydraulic fluid was present in the storage room on the second
floor of the west side of the building,[3]
and combustible paint thinner and lacquer were located on the east side.  Finally, temporary lighting had been
installed on the west side of the building by the electricians. 

C.  The Fire








Neal and Henderson departed
the building between 5:45 p.m. and 6:00 p.m. 
Henderson drove past the building at approximately 7:00 p.m. and
observed no evidence of fire or anything out of the ordinary.[4]  The fire was reported at 8:55 p.m.  James Graham (AGraham@), who is
the Assistant Fire Marshal of Wichita Falls and who served as the lead origin
and cause investigator regarding this matter, arrived at the scene eleven
minutes after the fire was first reported.[5]  Graham immediately began gathering
information regarding the fire, knowing that once the fire was out, it would be
his job to Afigure out
what happened.@

D.  The Fire=s Aftermath

While the actual fire was put
out within hours after the firefighters arrived, firefighters continued to put
water on the debris Aon and off@ over the next few days.  Graham
was initially present at the fire for six continuous hours before going home to
shower, put on his uniform, and return to the scene.  Graham then spent most of the next ten days
at the scene.  Shortly after the fire,
authorities decided that safety concerns required demolishing the building=s remaining walls.  As part of
his investigation, Graham took hundreds of pictures and video recordings of the
demolition process.  From an
investigative standpoint, the demolition of the building destroyed most of the
relevant evidence before Graham could actually enter the site.

E.  Graham=s Investigation and Conclusions

At trial, Graham explained
the methodology he employed while investigating the fire.  As Graham explained it, A[M]y job is to do the origin and cause investigations of fires that I=m assigned to.@  In addition to having been at the scene of
the fire within minutes of its being reported, Graham was already familiar with
the building through his inspection and approval of the fire suppression system
and elevator.








Graham also personally
interviewed all the relevant witnesses and reported as follows:

Forcher.  Forcher did not initially disclose the
presence of flammable hydraulic fluid. 
However, subsequent conversation revealed the hydraulic fluid had been
moved from the east side of the building to a storage room on the west side of
the building, where some of the electrical material was being stored.  Forcher never suggested Skipworth had
scorched any wood-studs in the building; instead, Forcher Aspecifically made the comment that he was happy with the way things
were going relative to all the trades,@ including Skipworth.

A-Bar Electric.  Larry Hickerson of A-Bar Electric provided
information regarding the building=s temporary and permanent lighting and electrical system in place at
the time of the fire.

Otis Elevator.  Robert Butler and Lorenzo Parish of Otis
Elevator provided information regarding installation of the elevator and
leaving hydraulic fluid behind at the scene.

Skipworth.  Neal and Henderson related their activities
on the day in question, which was in accordance with applicable building code
requirements.

Ramon Painting.  The painters (Ramon De=Oliceira and Michael Saenz) described their activities in the building
on the day in question, the materials they left behind (including paint thinner
and lacquer), and their observations. 
Graham was unable to identify the source of the unusual odors the painters
purportedly noticed as they departed.

Henderson=s
Wife.  Shalena Henderson (the wife of
Neal=s
assistant plumber) confirmed her husband=s statement that she and her
husband observed the building at approximately 7:00 p.m. on the night of the
fire and noticed nothing unusual.

 








Graham determined that the
fire originated on the west side of the building, where Skipworth, and only
Skipworth, had been working. However, based on his investigation of the fire,
Graham believed that no single cause was more probable than another.  Graham admitted that he could not rule out
Skipworth=s pipe
sweating operations as the cause of the fire. 


Graham was unable to
determine the exact point of origin of the fire or its cause.  According to Graham, because there were any
number of possible causesCnone of
which was more likely than anotherCthe governing standards of fire investigation required the
investigator to conclude the cause as Aundetermined.@[6]  On direct examination at trial
by Richmond Condominiums, Graham categorically rejected the contention that
Skipworth=s employees
were the only possible cause of the fire.

Q.     So the only possible source of ignition during the day would be
Skipworth Plumbing employees, John Neal and Phillip Henderson?

 

A.     That=s not
true.

 

Graham=s conclusion that the cause and origin of the fire could not be
determined, meaning that no one cause was more likely than another, was based
on the following:








1.     In his conversations with Graham, Forcher never indicated or
suggested that Skipworth had scorched any of the wood studs around which its
employees were working.  In fact, Forcher
indicated to Graham that he was pleased with Skipworth=s
work.

 

2.     The presence of temporary lighting on the west side of the
building.

 

3.     Numerous parties had access to the west side of the building on
the day of the fire.

 

4.     The fact that the fire itself and subsequent demolition of the
building by the authorities destroyed most of the physical evidence pertaining
to the fire.

 

5.     Graham=s
numerous personal interviews of virtually all known persons with potentially
relevant knowledge regarding the fire.

 

6.     The lack of any evidence found during the course of Graham=s
investigation of wood studs having been scorched by Skipworth=s
employees.

 

7.     The record of prior break-ins and the thefts at the building. 

 

8.     The presence of transients in the immediate area of the building
and the unusually cold weather on the night of the fire.

 

9.     The presence of flammable liquids at the scene left by the
painters, including paint thinner and lacquer. 

 

10.   The presence of flammable hydraulic fluid moved from the east side
to the west side of the building by Forcher.

 

11.   Skipworth=s
compliance with building code requirements regarding Afire
watch@ and
protective measures.

 

12.   The presence of cigarette smokers Forcher and Humphries at the
scene the day of the fire.

 








As a result of his
investigation, Graham testified that each of the following were also equally
possible causes of the fire at issue, in addition to Skipworth=s Asweating@ copper pipes:

1.     The permanent electrical
system in the building.

2.     The temporary electrical
system in the building.

3.     Arson.[7]

4.     Transients.

5.     Cigarette smokers.

6.     The paint thinner or
lacquer.

However, Graham did admit that he had no evidence
to support any of these alternative theories of the fire=s cause, and his testimony established that he could neither eliminate
these alternative causes nor substantiate those theories. 

F.  Richmond Condominiums= Retained Expert Buddy Jenkins 

On the day following the
fire, Richmond Condominiums retained Buddy Jenkins (AJenkins@) of Rimkus
Consulting Group, Inc. to investigate the fire. 
As to his qualifications and foundation for his testimony, Jenkins
testified as follows:








Q.
[W]ithout going into a whole lot of detail unless I ask for it, you could just
tell the jury your training and experience as it relates to determining the
cause and origin of fires.

 

A.  I got out of the military in 1959.  I went to work with the fire department at
that time. I worked with the City of Irving for 14 years.  I transferred from there over to the
Department of Public Safety at DFW Airport. 
I worked there 14 more years.  I
went up through the ranks, starting at the bottom going with -- to -- when I
retired in >87, I
retired as a division commander.  And I
stayed retired for about a year, worked on my farm, had some things I wanted to
do there. . . . [A]nd  then I started
doing what I=m doing
right now.

Q.  What training have you had in cause and
origin investigation, educational training?

 

A.  Well, I=ve -- I=ve
got 28 years working with municipal fire departments.  And during those 28 years -- especially after
I obtained the rank of district officer, which would be either lieutenant or
captain, I held both positions.  Once you
get into those positions you get into an area where you start making opinions
and find the cause and origin of fires. 
When it gets to a certain type and size of fires, then we call in the
Fire Marshal and his staff.  But -- and
then eventually I worked in with the fire investigation people and -- before I
retired in 1987.

 

Jenkins first visited the
scene three days after the fire occurred. 
When Jenkins arrived at the scene, the debris had been removed.  In conjunction with his investigation, Jenkins
interviewed Forcher and Scott Skipworth. 
Jenkins indicated that he was not as familiar with the potentially
relevant building codes as someone like Graham. 
Jenkins told the jury on direct examination that it was his opinion that
the fire was caused by negligent plumbing activities and that there were no
other potential causes of the fire.








Jenkins never spoke with
plumbers Neal and Henderson or the painters who were working in the building on
the day of the fire, and he never spoke to the electricians, who Jenkins
erroneously thought were not present in the building on the day of the
fire.  Jenkins was not certain who was in
the building on the day of the fire.

At trial, Jenkins identified
the following fire-related factors: (1) Skipworth=s failure to use protective shields while sweating pipes, (2) problems
with Skipworth=s Afire watch,@ (3) Acode violations@ by
Skipworth, (4) scorched wood studs where Skipworth was sweating copper pipes,
and (5) his conclusion, based on his experience, that torch operations
regularly cause fires.  Jenkins stated
that the only logical and reasonable conclusion was that Skipworth=s pipe sweating operations caused the fire.  Although Jenkins identified these factors in
his trial testimony to support his opinion that Skipworth caused the fire, they
do not appear in his report of April 16, 2002, or in his verified deposition.

Jenkins testified that
Skipworth=s employees
violated the applicable fire code for Wichita Falls when they failed to conduct
a proper Afire watch@, and were using torches in close proximity to wooden structural
members.








Jenkins also acknowledged to
the jury that he had previously identified other possible causes of the fire at
issue.  One of Athe most likely causes of the fire@ identified by Jenkins was Aextension cords and/or work lights left unattended.@ Other possible causes identified by Jenkins included an electrical
arc, a hot light, electrical equipment, flammable fluid including hydraulic
fluid and paint thinner, an electrical short, a match, and cigarette
smoking.  Further, Jenkins told the
Wichita Falls Fire Marshal he could not state whether the fire was the result
of an electrical event, heat from the plumbers, or a smoking incident.

G.  The Fire Marshal=s Criticism of Jenkins=s Investigation

Graham criticized Jenkins=s investigation on the whole as A[u]nprofessional, unreliable, and unethical.@  Graham was present during
Jenkins=s first visit to the fire scene on March 7 during the demolition
phase. Graham testified that Jenkins=s first visit to the scene lasted less than five minutes and concluded
with Jenkins stating, AThere=s nothing for me to do now.@  Jenkins=s second visit lasted less than one hour.








Graham also criticized the
fact that Jenkins never took time to interview all the relevant witnessCe.g., the painters or the plumbers. 
He further criticized Jenkins=s claims that he found physical evidence at the scene that supported
his scorched-wood-studs theory of causation as dubious and unprofessional,
given that Jenkins took no pictures of such evidence despite having a camera
with him while at the scene, nor did he sketch the location and nature of this
purportedly key evidence.  Graham also
questioned Jenkins=s
willingness to dismiss other possible causes, given that virtually all of the
evidence was destroyed by the fire or in the demolition process.  Graham stated that if you cannot find the
remains of a possible ignition source (i.e., cause) you know to have been
present, governing fire investigative standards preclude an investigator from
eliminating it as a possible cause, yet this is precisely what Jenkins did
according to Graham.

Wichita Falls Fire Marshal
David Collins indicated that the cause of the fire at issue was correctly
characterized as Aundetermined.@

H.  The Individual Joint Venturers= Testimony

During trial, Richmond
Condominiums asked Wachsman for his opinion about the value of the building
before and after the fire.  Richmond
Condominiums also inquired as to whether Wachsman had any opinions as to how
the fire started.  Wachsman testified
that he had personally hired Skipworth to do plumbing work for him in the past
and continued to do so because he believed they did good, safe, and
code-compliant work.  Wachsman knew of no
evidence indicating that Skipworth caused the fire at issue.  Instead, Wachsman believed that the fire was
merely an accident for which Skipworth should not be sued.








Similarly, Priester and
Scott, two of the other joint venturers, testified that they knew of no
evidence tending to show that Skipworth was responsible for the fire.  Moreover, while Priester, Scott, and Wachsman
were participants in the joint venture, none of them wished to individually
recover against Skipworth.

I.  The Jury=s Deliberations, Verdict, and Post-Verdict Proceedings

The jury began its
deliberations on Richmond Condominiums= claim of negligence against Skipworth at approximately 2:00 p.m. on
June 30, 2005.  Forty-five minutes later,
the jury rendered its unanimous verdict in favor of Skipworth, and the trial
court discharged the jury.  On August 15,
2005, the trial court entered a final judgment in favor of Skipworth based on
the jury=s verdict.

On September 15, 2005,
Richmond Condominiums filed a motion for new trial.  The motion for new trial contended that the
jury=s verdict was against the great weight and preponderance of the
evidence and that Skipworth=s closing argument was incurably prejudicial or inflammatory.  Skipworth responded to the motion for new
trial on October 11, 2005.  The motion
for new trial was overruled by operation of law, and Richmond Condominiums
filed a notice of appeal on November 14, 2005.

III.  Sufficiency of the Evidence

In its first issue, Richmond
Condominiums complains that the jury finding that Skipworth was not negligent
is against the great weight and preponderance of the evidence.  We disagree. 


A. Standard of Review








In reviewing an issue asserting that a finding is Aagainst the great
weight and preponderance@ of the evidence, we must consider and
weigh all of the evidence and set aside the finding only if the evidence is so
weak or the finding is so contrary to the great weight and preponderance of the
evidence as to be clearly wrong and unjust. 
Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001); In
re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

Generally, we do not have to detail supporting evidence
when upholding factual sufficiency of the evidence underlying the trial court=s judgment.  Gonzalez v.
McAllen Med. Ctr., Inc., 195 S.W.3d 680, 681
(Tex. 2006); Ellis County State Bank v. Keever, 888 S.W.2d 790,
794 (Tex. 1994).  Findings of fact are
the exclusive province of the jury or trial court.  Bellefonte Underwriters Ins. Co. v. Brown,
704 S.W.2d 742, 744B45 (Tex. 1986).  A court of appeals cannot make original
findings of fact; it can only Aunfind@ facts.  Tex. Nat'l Bank v. Karnes, 717 S.W.2d
901, 903 (Tex. 1986).

When conducting a factual sufficiency review, a court of
appeals must not merely substitute its judgment for that of the trier of
fact.  Golden Eagle Archery, Inc. v.
Jackson, 116 S.W.3d 757, 761 (Tex. 2003). 
The trier of fact is the sole judge of the credibility of witnesses and
the weight to be given to their testimony. 
Id.

B. Application








As detailed above, our review
of the evidence demonstrates a clear conflict in the positions of the parties,
with both positions being supported by expert and lay testimony.  For example, Jenkins testified that the fire
at issue was caused by negligent plumbing activities and there were no other
potential causes.  Conversely, Graham was
not able to determine the point of origin of the fire and concluded that the
cause was undetermined.  The jury agreed
with Skipworth, and findings of fact are the exclusive province of the
jury.  See Bellefonte Underwriters,
704 S.W.2d at 744B45. 
Under these circumstances, we cannot say that the
evidence demonstrates that the jury findings are clearly wrong and unjust.  See Dow Chem., 46 S.W.3d at
242.  We
overrule Richmond Condominiums= first issue.

IV. Improper Behavior of
Skipworth=s Counsel

In its second issue, Richmond
Condominiums argues that the trial court erred by not sanctioning opposing
counsel for contacting the Richmond Condominium joint venturers during the
litigation without the presence of Richmond Condominiums= counsel.

A. Background








After the fire, the joint
venture made a claim on its insurance policy, and Western Heritage
paid $938,189.72 to the joint venture. 
As one of the conditions of receiving the insurance proceeds, each joint
venturer contractually agreed to assist Western Heritage in any subsequent  suit against a responsible party.  Thereafter, Richmond Condominiums sued
Skipworth for negligence; Skipworth answered the suit and then filed a
counterclaim against the joint venture.[8]  

Richmond Condominiums
contends that even though Skipworth knew the joint venture to be represented by
counsel, in the months leading up to trial, Skipworth=s lawyers repeatedly contacted the members of the joint venture
directly, without ever notifying counsel for Richmond Condominiums.  In particular, counsel for Skipworth
allegedly sought to have joint venturers Priester, Scott, and Wachsman sign affidavits
stating that Skipworth was not at fault, that the suit was meritless, and that
counsel for the Richmond Condominiums joint venture had no authority to bring
the instant action.  When Richmond
Condominiums became aware of Skipworth=s counsel=s actions,
it filed a motion requesting Amonetary sanctions, for an order striking all of [Skipworth=s] pleadings, prohibiting them from putting on any witnesses, or any
evidence, in the alternative, prohibiting them from putting on any evidence or
cross-examining those persons whom they unethically interviewed.@ 

The evidentiary material
attached to Richmond Condominiums= motion included the following:








1.     Unauthenticated correspondence from
Richmond Condominiums=
counsel to Skipworth=s
counsel insisting that contact with members of the joint venture is improper
and demanding it be stopped.

 

2.     Three pages from Skipworth=s
supplemental disclosures, one of which is an unauthenticated letter from Scott
stating that he did not knowingly give Western Heritage permission to sue
Skipworth and that, in his opinion, Athere is no way to point the
blame at Skipworth Plumbing.@

 

3.     A copy of the proof of loss in which all
joint venturers authorized Western Heritage to sue any third party who may be
liable in damages to Richmond Condominiums and pledged Afull
cooperation@ in
such action.

 

4.     Affidavits from Richmond Condominiums=
attorneys asserting that they saw Skipworth=s attorneys talking to a representative
of third-party defendant A-Bar Electric. 
Skipworth nonsuited A-Bar Electric shortly thereafter.

 

5.     An unsigned and unauthenticated copy of the
Richmond Condominiums joint venture agreement.

 

At the pretrial hearing requesting sanctions on this matter, counsel
for Skipworth addressed the court as follows:

In
this case we=ve
got Larry Scott and Steve Priester who both have the . . . opinion that Scott
Skipworth did nothing wrong.  Now,
realize, Judge, I=m
also representing a member of this partnership. 
So it was our understanding, given the testimony that had developed,
that these gentlemen didn=t
fall under the purview of the disciplinary rule.  We contacted them.  Subsequently, we spoke to Kerry Roach, and by
the way, Larry Scott also had spoken to Kerry Roach.  Mr. Roach informed us that Larry Scott was
not going to have any problem giving us whatever we wanted, and he
[Larry Scott] did, and he told us he didn=t
think Mr. Skipworth did anything wrong.  And then he told us that Mr. Priester was not
going to take a position on the authority issue, but he is of the opinion that
Mr. Skipworth also did nothing wrong in this case.  

 








Now,
Judge, we believe the testimony that=s going to come from the
witnesses in this case, including Mr. Forcher and Mr. Wachsman, is that Mr.
Skipworth -- they=re
not aware of anything Mr. Skipworth did wrong. 
Now, they are going to say we believe, based on what we=ve
been told, that the fire started because of Mr. Skipworth. . . . But there=s
nothing in the rules of disciplinary conduct that prevents us from contacting
somebody that has no managerial responsibility in a defunct company.  Whether they have a contract with them or not
and whether they think those people have breached the contract or not, it=s
simply they can take up on their own.  But
we fully intend to call both Mr. Priester and Mr. Scott to testify that they
were members of this partnership when it was in existence.  Based on what they know, they don=t
believe that Scott Skipworth or his company did anything wrong to start this
fire.  [Emphasis
added.]  

 

The court
denied Richmond Condominiums any relief. 
Furthermore, the court permitted the joint venturers to testify at trial
that, in their opinion, Skipworth was not negligent, that Skipworth did not
cause the fire, and that they did not want the suit against Skipworth to be
prosecuted.  Apparently, the court
reasoned that even though the joint venture had never been formally dissolved,
it had ceased doing business simply because the building had burned; therefore,
the members were no longer in managerial positions and were fair game for ex
parte contact.

B. Standard
of Review








An appellate
court reviews a trial court=s ruling on a motion for sanctions for an abuse of discretion.[9]  Cire v. Cummings, 134 S.W.3d 835, 838
(Tex. 2004).  The abuse of discretion
standard requires us to determine whether the trial court Aacted without reference to any guiding rules or principles; in other
words, whether the act was arbitrary and unreasonable.@  Prevost v. Ins. Advisors of
Tex., Inc., 46 S.W.3d 289, 292 (Tex. App.CFort Worth 2001, pet. denied).  Merely because an appellate court would in a
similar circumstance decide the matter differently does not demonstrate that an
abuse of discretion has occurred.  Id.

C.
Application

As shown
above, it is abundantly clear that counsel for Skipworth had been in direct
contact with the joint venturers.  Texas
Disciplinary Rule of Professional Conduct 4.02 reads,

In representing a client, a lawyer shall not communicate or cause or
encourage another to communicate about the subject of the representation with a
person, organization or entity of government the lawyer knows to be represented
by another lawyer regarding that subject, unless the lawyer has the consent of
the other lawyer or is authorized by law to do so.

 

Tex. Disciplinary R. Prof=l Conduct 4.02(a).

 








At the time
of these contacts, Skipworth had a counterclaim against the joint venture.  Further, according to the joint venture
agreement, each joint venturer was exposed to potential liability as a result
of the counterclaim, and the joint venturers who testified at trial did so as
managerial agents of Richmond Condominiums. 
Thus, it is clear that each joint venturer was a party to the lawsuit.

Furthermore,
each of the joint venturers had also signed the ASworn Statement in Proof of Loss,@ which reads as follows:

The insured [Richmond Condominiums] hereby covenants that no release
has been or will be given to or settlement or compromise made with any third
party who may be liable in damages to the insured and the insured in
consideration of the payment made under this policy hereby subrogates the said
Company [Western Heritage] to all rights and causes of action the said insured
has against any person, persons or corporations whomsoever for damage arising
out of or incident to said loss or damage to said property and authorizes said
Company to sue in the name of the insured but at the cost of the Company any
such third party, pledging full cooperation in such action.  [Emphasis added.]  

 








We hold that under the plain
language of this contract, the individual joint venturers as well as Richmond
Condominiums, as the insured joint venture, were the same party as Western Heritage
for purposes of the suit against Skipworth. 
Richmond Condominiums was represented by counsel, and, therefore, the
joint venturers were also represented by counsel.  Accordingly, we hold that the trial court
abused its discretion to the extent that it based its decision not to impose
sanctions on its conclusion that the joint venture no longer existed.

In its
motion to the trial court, Richmond Condominiums based its request for
sanctions solely on its contention that Skipworth violated disciplinary rule
4.02, but the thrust of its complaint relates to Skipworth=s conduct in the discovery process by improperly contacting
party-witnesses.  Under rule 215.3 of the
rules of civil procedure, if the trial court finds that a party is abusing the
discovery process in seeking discovery, then it may, after notice and hearing,
impose any appropriate sanction authorized by the rule.[10]  Tex.
R. Civ. P. 215.3.  We hold that
the ex parte contacts of Skipworth=s counsel with the represented opposing parties, in apparent violation
of the disciplinary rules, constitute an abuse of the discovery process.  Therefore, the trial court=s unreasonable failure to impose sanctions for this conduct was an
abuse of discretion.  See Prevost,
46 S.W.3d at 292.  








Richmond
Condominiums urges us on rehearing to reverse and render a monetary sanctions
award as well as to reverse and remand for a new trial without the Atainted witnesses.@  However, we may reverse only
if the trial court=s failure to
impose sanctions probably caused rendition of an improper judgment or probably
prevented the appellant from properly presenting the case to this court.  See TEX. R. APP. P. 44.1(a); Romero v. KPH Consol., Inc., 166 S.W.3d
212, 220 (Tex. 2005).  Furthermore, the
choice of sanctions is within the sound discretion of the trial court, subject
only to the requirement that the sanctions must be Ajust.@  TransAmerican Nat. Gas Corp. v. Powell,
811 S.W.2d 913, 917 (Tex. 1991) (orig. proceeding).  Whether sanctions are just is determined by a
two-part process.  Id.  First, there must be a direct relationship
between the offensive conduct and the sanction imposed, which requires a trial
court to at least attempt to determine whether the offensive conduct is attributable
to counsel only, or to the party only, or to both.  Id.  Second, the sanction must not be
excessive.  Id.  

Under the
first TransAmerican prong, the sanction should be visited upon the
offender.  Id.  On the one hand, a lawyer cannot shield his client
from sanctions; a party must bear some responsibility for its counsel=s discovery abuses when it is or should be aware of counsel=s conduct and the violation of discovery rules.  Id. 
On the other hand, a party should not be punished for counsel=s conduct in which it is not implicated apart from having entrusted to
counsel its legal representation.  Id.









Richmond
Condominiums points us to nothing in the record showing that these ex parte
contacts were anything other than the actions of Skipworth=s counsel alone.  Nothing in the
record suggests that Skipworth directed, approved, or was even aware of its
counsel=s unethical actions.  Because Aa party should not be punished for counsel=s conduct in which it is not implicated apart from having entrusted to
counsel its legal representation,@ id., any sanction that punished Skipworth would have been
impermissible.  Accordingly, on
this record, the only sanctions that would have been appropriate would have
been those assessed against Skipworth=s counsel; any evidentiary sanction affecting Skipworth=s ability to develop its defense at trialCsuch as striking the allegedly Atainted witnesses@Cwould have been unfair and improper because it would have punished Skipworth
for a transgression that it did not commit and for which it bore no
responsibility.  See id.  

Richmond
Condominiums cites Schenck v. Ebby Halliday Real Estate, Inc., 803
S.W.2d 361 (Tex. App.CFort Worth
1990, no writ), to argue that evidence Atainted by unethical or unlawful conduct@ should be excluded.  In Schenck,
we affirmed the trial court=s exclusion of an expert witness=s testimony because the expert for Ebby Halliday, in violation of the
rules of civil procedure, had trespassed upon Schenck=s property to gather information to formulate his expert opinion.  Schenck is a pre-TransAmerican
case, however, so it does not even attempt to determine whether Ebby Halliday
bore any responsibility for the expert=s offensive conduct or consider whether Ebby Halliday was actually
being punished for the wrongdoing of its expert=s conduct alone.  








Furthermore,
in Schenck, the testimony that was excluded stemmed directly from the
expert=s improper conductCthat is, the expert=s opinion was directly formulated from the information wrongfully
obtained by his trespass on the Schencks= property.  Here, in contrast,
the record does not show that the content of the joint venturers= testimony was necessarily a direct result of their contact with
Skipworth=s
counsel.  Even though the joint venturers
testified at trial that they thought Skipworth did not cause the fire and that
they did not want Skipworth to be prosecuted, there is no evidence that
Skipworth=s counsel
actually induced them to so testify, or that they would have testified
differently had Skipworth=s counsel
not contacted them.[11]  Therefore, although Skipworth=s counsel=s conduct
apparently violated the disciplinary rules, the record does not affirmatively
link the content of the joint venturers= testimony at trial to this violation. 
Accordingly, Schenck does not mandate a conclusion that the joint
venturers= testimony
must automatically be excluded.








Because we
hold that, on this record, an appropriate sanction for the unethical
conduct of Skipworth=s counsel
could not have been assessed against Skipworth itself and could not have
affected the evidence presented at trial, the trial court=s abuse of discretion did not cause the rendition of an improper
judgment or prevent Richmond Condominiums from properly presenting its
appeal.  Therefore, it does not warrant
reversal.  See Tex. R. App. P. 44.1(a).[12]  We overrule Richmond Condominiums= second issue.  

V. Other
Alleged Errors

In its third
issue, Richmond Condominiums argues that the trial court committed reversible
error by (1) forcing Richmond Condominiums to present evidence of insurance to
the jury and (2) admitting speculative testimony from nonexperts in violation
of the court=s limine
order and over Richmond Condominiums= objections.  We shall discuss
each assertion in turn.    

A. Evidence
of Insurance 

Richmond
Condominiums argues that Skipworth=s examination of the joint venturers improperly forced Richmond
Condominiums to interject insurance into the case.  We disagree. 

1.
Background 








During the
pretrial proceedings, Richmond Condominiums initially advised the trial court
that it wished to introduce the Aproof of loss@ and
Richmond Condominiums= insurance
policy into evidence, but it wanted to avoid publishing them to the jury.  Skipworth disagreed as to the relevance of
the proof of loss, but it offered to stipulate that Richmond Condominiums was
entitled to bring its subrogation claim for the amount it had paid under its
policy.  Richmond Condominiums= counsel insisted, however, that he was entitled to use the proof of
loss in his cross-examination of Scott SkipworthCAIt=s a sworn
statement by Mr. Skipworth.  And I=ll have to cross-examine him about it.@

Based on
Richmond Condominiums= insistence
that it would cross-examine Scott Skipworth with the proof of loss, the trial
court noted that Richmond Condominiums was introducing the document for all
purposes and said, Ajust got
through saying that you=re going to
have to use that to -- with the gentleman to prove up and there=s an admission by him, then you=re injecting insurance into the case.@  Ultimately, Richmond
Condominiums= counsel
conceded that he could not have it both ways and stated,  

I=m not
certain how we=ll
deal with it, but I just wanted to bring it to the Court=s
attention because I=ve in
[sic] been in positions before like this where I=ve
come in and I=ve
used an insurance document for noninsurance purpose and smarter for it
[sic].  So I just wanted to alert the
Court to that kind of in advance.

 








During
opening argument, Richmond Condominiums told the jury that it had spent
$938,198.72 on the project at the time of the fire, which was the amount stated
on the proof of loss that Richmond Condominiums submitted to Western
Heritage.  Forcher then testified that
approximately $930,000 had been put into the project at the time of the
fire.  Richmond Condominiums sought to
bolster Forcher=s testimony
by introducing invoices, but it ultimately abandoned the effort.  Richmond Condominiums then sought
unsuccessfully to have Forcher testify as to the appraised value of the project
and what the eventual value of the project would have been.

Richmond
Condominiums then chose to offer the proof of loss as evidence of its
damages.  Based on Richmond Condominiums= offer, the proof of loss was admitted into evidence without
limitation over Skipworth=s
objection.  According to Richmond
Condominiums, the proof of loss represented the amount that AMr. Skipworth admits the actual cash value of this property [was at]
the time of its loss[.]@  Prior to its cross-examination of Forcher,
Skipworth sought clarification as to the use of the proof of loss to
demonstrate that Skipworth was not responsible for the fire.  The trial court allowed the proof of loss to
be used in conjunction with the cross-examination of Forcher.








Scott then
testified, without objection, that he had no criticism of Skipworth and was
aware of no evidence that Skipworth=s negligence caused the fire at issue. 
Moreover, Scott testified that he had no personal desire to sue
Skipworth for causing the fire.  In
response, Richmond Condominiums= counsel presented the proof of loss to Scott and elected to ask Scott
why he signed it. In response to Richmond Condominiums= direct question, Scott said, AI was under the impression that the insurance company was paying the
-- making their payment to the corporation for the damages, and I was told that
I needed to come up and sign that document, you know, because the loan was
being paid off.@

Skipworth
again sought clarification as to the extent to which the proof of loss could be
used in cross-examination in light of Richmond Condominiums= introduction and use of same. 
The trial court noted that Richmond Condominiums had brought the proof
of loss into focus:  AWell, the door has definitely been opened.  And I mean[,] . . . [y]ou opened it up . . .
you knew what the document was . . . [. Y]ou asked him the meaning of it.@








After
Skipworth examined Scott regarding the proof of loss, Richmond Condominiums
again returned to its questioning of Scott=s motivation and intent with respect to insurance.  Indeed, Richmond Condominiums carefully
examined Scott as to the particular meaning of the exact language found in the
proof of loss.  During Skipworth=s case in-chief, Wachsman was called by deposition.[13]
When asked if he would have signed the proof of loss had he known Richmond
Condominiums was going to sue Skipworth, Wachsman testified, AI don=t think I
would=ve.@  Richmond Condominiums then proceeded to offer
additional testimony by Wachsman regarding the proof of loss and Richmond
Condominiums= coverage
for the loss.

2.
Analysis  

A review of
the trial proceedings reveals that Richmond Condominiums apparently did not
enter the proof of loss into evidence to establish evidence of damages in
response to any questioning by Skipworth. 
Only after Richmond Condominiums got the proof of loss admitted
did Skipworth ask the joint venturers the questions that allegedly forced
Richmond Condominiums to present evidence of insurance to the jury.  Furthermore, the proof of loss was admitted
without limitation.  Evidence
admitted without limitation comes into evidence for any and all purposes.  Gabriel v. Lovewell, 164 S.W.3d 835, 845
(Tex. App.CTexarkana
2005, no pet.).  In the absence of a
request for such a limitation, Athe court=s action in
admitting such evidence without limitation shall not be a ground for complaint
on appeal.@  Tex.
R. Evid. 105(a).  Therefore, we
hold that Richmond Condominiums= contention that the trial court erred by forcing it to present
evidence of insurance to the jury is without merit.  Accordingly, we overrule this portion of
Richmond Condominiums= third issue.       B.
Admitted Testimony








In this part
of its third issue, Richmond Condominiums asserts that the trial court erred by
allowing the testimony of the joint venturers concerning Skipworth=s liability for the fire, which amounted to nothing more than
speculation from nonexperts.   

1.
Standard of Review 

A trial
court=s rulings in admitting or excluding evidence are reviewable under an
abuse of discretion standard.  Nat=l Liab. & Fire Ins. Co. v. Allen, 15
S.W.3d 525, 527 (Tex. 2000).  To
determine whether a trial court abused its discretion, we must decide whether
the trial court acted without reference to any guiding rules or principles; in
other words, we must decide whether the act was arbitrary or unreasonable.  Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241B42 (Tex.
1985), cert. denied, 476 U.S. 1159 (1986).  Merely because a trial court may decide a
matter within its discretion in a different manner than an appellate court
would in a similar circumstance does not demonstrate that an abuse of
discretion has occurred.  Id.

An abuse of
discretion does not occur when the trial court bases its decisions on
conflicting evidence.  In re Barber,
982 S.W.2d 364, 365 (Tex. 1998) (orig. proceeding).  Furthermore, an abuse of discretion does not
occur as long as some evidence of substantive and probative character exists to
support the trial court=s
decision.  Butnaru v. Ford Motor Co.,
84 S.W.3d 198, 211 (Tex. 2002).








To preserve
a complaint for our review, a party must have presented to the trial court a
timely request, objection, or motion that states the specific grounds for the
desired ruling, if they are not apparent from the context of the request,
objection, or motion.  Tex. R. App. P. 33.1(a); see also Tex. R. Evid. 103(a)(1).  If a party fails to do this, error is not preserved,
and the complaint is waived.  Bushell
v. Dean, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh=g).  The objecting party must
get a ruling from the trial court.  This
ruling can be either express or implied. 
Residential Dynamics v. Loveless, 186 S.W.3d 192, 195 (Tex. App.CFort Worth 2006, no pet.).

2.
Application 

Richmond
Condominiums first argues that its motion in limine preserved error.  However, a trial court=s ruling on a motion in limine preserves nothing for review; a party
must object at trial when the testimony is offered in order to preserve error
for appellate review.  Hartford
Accident & Indem. Co. v. McCardell, 369 S.W.2d 331, 335 (Tex. 1963); Greenberg
Traurig of N.Y., P.C. v. Moody, 161 S.W.3d 56, 91 (Tex. App.CHouston [14th Dist.] 2004, no pet.). 
Therefore, Richmond Condominiums was required to lodge a proper
objection to any testimony that it felt was being admitted in error.








On
cross-examination Skipworth asked Wachsman, AYou don=t have any
evidence to show this jury that my client [Skipworth] was negligent in any way
causing this fire?@  Richmond Condominiums promptly objected.  However, after Skipworth explained its
reasoning, the trial court asked, A[I]sn=t that a
subject for cross-examination?@  Richmond Condominiums replied,
AOkay.@ Thus,
although Richmond Condominiums made a timely objection, it failed to get a
ruling on that objection.  Accordingly,
any complaint relating to this question was not preserved for our review.

Richmond
Condominiums did properly preserve other questions asked by Skipworth of the
joint venturers.  Priester was asked, ADo you have any criticism of the work that Skipworth Plumbing did at
Richmond Condominiums?@ and whether
he Apersonally ha[d] no desire to recover or sue Mr. Skipworth.@  Richmond Condominiums objected
to the questions as lacking foundation and on relevancy grounds,
respectively.  The trial court overruled
Richmond Condominiums= objection
on both grounds.  Priester then answered
no to both questions.  Scott too was
asked whether he had any Adesire to
sue or recover anything from Skipworth Commercial Plumbing.@  Again, Richmond Condominiums
objected and was overruled.  Scott also
answered no to the question.  

Likewise,
Wachsman was asked whether he was Aseeking anything individually from Mr. Skipworth or his plumbing
company in this case.@  Lastly, Skipworth was allowed to read
Wachsman=s deposition into evidence over Richmond Condominiums= running relevancy objection. 
Wachsman=s deposition
testimony related to his disagreement with Richmond Condominiums= decision to sue Skipworth and Wachsman=s claim that he would not have signed the proof of loss had he known
that Skipworth would be sued.








We agree
with Richmond Condominiums that a proper foundation had not been laid to
qualify Priester to testify whether he had any criticism of Skipworth=s plumbing work.  A witness is
qualified to testify as an expert if he has the appropriate knowledge, skill,
experience, training, or education.  Tex. R. Evid. 702; Roberts v.
Williamson, 111 S.W.3d 113, 120B21 (Tex. 2003).  There was no
testimony or other evidence presented that qualified Priester to testify to the
adequacy of Skipworth=s plumbing
work.  Priester=s and Scott=s testimony
that they had no personal desire to recover from Skipworth was irrelevant.
Likewise, Wachsman=s testimony
that he was not individually seeking to recover anything from Skipworth was
also irrelevant.  None of that testimony
even remotely related to whether Skipworth was liable for the fire.  See Tex.
R. Evid. 401 (defining Arelevant evidence@ as that with any tendency to make consequential facts more or less
probable).  Moreover, whether Wachsman
agreed with the decision to sue Skipworth or whether he would have signed the
proof of loss had he known Skipworth would be sued is also irrelevant.  Thus, it was error for the trial court to
allow this testimony.  See Tex. R. Evid. 402 (stating that
evidence which is not relevant is inadmissible). 

We hold that
the trial court acted without reference to any guiding rules or principles and
therefore acted arbitrarily and unreasonably. 
See Downer, 701 S.W.2d at 241B42.  Having found error, we must
now assess whether those errors were harmful. 









3.
Harm Analysis

We will not
reverse a trial court=s judgment
because of an erroneous evidentiary ruling unless the ruling probably caused
the rendition of an improper judgment.  Horizon/CMS
Healthcare Corp. v. Auld, 34 S.W.3d 887, 906 (Tex. 2000); Owens-Corning
Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex. 1998); see also Tex. R. App. P. 44.1(a); Romero,
166 S.W.3d at 220.  The complaining party
must usually show that the whole case turned on the evidence at issue.  City of Brownsville v. Alvarado, 897
S.W.2d 750, 753B54 (Tex.
1995).  We examine the entire record in
making this determination of harm.  Interstate
Northborough P=ship v.
State, 66 S.W.3d 213, 220 (Tex. 2001).








As we held
above, Richmond Condominiums has shown that errors occurred.  However, after examining the entire record,
we are unable to say that the errors probably caused the rendition of an
improper verdict or that the errors prevented Richmond Condominiums from presenting
its case to the court.  See TEX. R. APP. P. 44.1(a); Romero, 166 S.W.3d at 220.  As detailed throughout this opinion, there
was a wealth of conflicting lay and expert testimony and evidence presented at
trial by both parties.  In that context,
the above improperly admitted testimony was but a fraction of the overall
evidentiary picture that was before the jury. 
We hold that even if the above testimony had been excluded, it would
probably not have changed the outcome of the whole case.  Therefore, Richmond Condominiums cannot show
that the whole case turned on the evidence at issue.  See Alvarado, 897 S.W.2d at 753B54.  Accordingly, we overrule
this portion of Richmond Condominiums= third issue.     

VI. Jury
Argument

In its
fourth issue, Richmond Condominiums contends that Skipworth made improper jury
arguments during closing arguments that were so inflammatory that they were
incurable and constitute reversible error. 
Again, we disagree.

A.
Background 

In order to
analyze the propriety of Skipworth=s closing argument, we must first review Richmond Condominiums= preceding closing argument. 
The relevant portion of Richmond Condominiums= argument was as follows: 

[T]he amount.  Mr. Forcher said two and a half million
dollars.  The son-in-law, Mr. Wachsman,
probably the funniest man I=ve ever seen on the witness
stand, said that if it was finished, more likely in his experience, it would be
$1,500,000.  We know they had put
$950,000 put into the building.  I would
suggest to you that=s the
cost, the cost is simply different from fair market value.  

What is the market value of
the building the moment it burned? $1,500,000. 
The market value afterwards, zero. 
So $1,500,000 is the number to put in here.  

 








The fact that there=s insurance
in this case . . . is irrelevant.  Each
day we all stood here and pledged allegiance to the flag.  Remember the last phrase of that pledge, Aliberty
and justice for all.@  Just because you=re an
insurance company doesn=t mean you=re
not entitled to justice.  I can tell you
the fact that this was partially insured shouldn=t
play any part in your deliberation. 
[Emphasis supplied.]  

 

The portion
of Skipworth=s closing
argument that Richmond Condominiums complains of was as follows:

Now, Ladies and Gentlemen,
let=s
make something real clear.  The people
suing in this case are Western Heritage Insurance Company, the company that got
premiums from this joint venture to issue a builder=s
risk policy to insure for accidents that would occur on the property.  That=s why we=re
here.  That=s why
Mr. Forcher isn=t
here.  That=s why
Mr. Wachsman and Mr. Scott and Mr. Priester all took this witness stand and said
he [Skipworth] did nothing wrong.  The
reason we=re
here is because this insurance company took premiums to insure a risk, the
building burned and now they want to profit from it.  

 

You heard him say the number
should be a million-five.  But they only
paid $938,000 on this thing.  Now, they
want to make money on this. . . . 

 

What we have here is an
insurance company that doesn=t want to live up to their
obligation, an insurance company who issued a policy to cover accidents.  And that=s what we have here.  No one in this case can deny the fact that
accidents happen. . . .  

B. Standard of Review   

 








Control of counsel=s conduct during
jury argument rests in the sound discretion of the trial court.  Wells v. HCA Health Servs. of Tex., Inc.,
806 S.W.2d 850, 854 (Tex. App.CFort Worth 1990,
writ denied); see also Tex. R.
Civ. P. 269.  The test for
improper jury argument is whether the argument could have persuaded a juror of
ordinary intelligence to agree to a verdict contrary to that to which he would
have agreed but for the argument.  See
Welch v. McLean, 191 S.W.3d 147, 161 (Tex. App.CFort Worth 2005,
no pet.) (op. on reh=g). 
Reversal is required only when the entire record shows that argument was
improper, uninvited and unprovoked, preserved by a timely objection, and
incurable by instruction, withdrawal, or trial court reprimand.  See Standard Fire Ins. Co. v. Reese,
584 S.W.2d 835, 839 (Tex. 1979); Welch, 191 S.W.3d at 161.  Further, an appellant must show that the
argument constituted harmful error by its nature, degree, and extent.  Standard Fire, 584 S.W.2d at 839.  The party seeking reversal based on an
allegedly improper argument must show that the probability that the improper
argument caused harm is greater than the probability that the verdict was
grounded on the proper proceedings and evidence.  Id. at 840.

C.
Application

The areas of
Skipworth=s closing
argument that Richmond Condominiums complains of can be categorized into three general
areas:  (1) references related to
insurance, (2) the claim that Western Heritage was attempting make a profit in
the case, and (3) the reference to the joint venturers= testimony that Skipworth Adid nothing wrong.@   








A review of
the closing arguments reveals that it was Richmond Condominiums, not Skipworth,
who first referenced the involvement of insurance and the fact that the party
suing in the name of Richmond Condominiums was really an insurance
company.  Likewise, it is plain from the
words, A$1,500,000 is the number you put in here,@ that Richmond Condominiums did in fact initially ask the jury to
award it $1,500,000.  No authority holds
that Skipworth was required to sit on its hands and not respond to Richmond
Condominiums=
arguments.  As it relates to these two
areas, Skipworth=s arguments
were in response to and confined to the arguments of opposing counsel in
compliance with rule 269.  See Tex. R. Civ. P. 269(e).  Because Skipworth=s arguments in these two areas were invited and provoked, we cannot
hold that they were improper.  See
Welch, 191 S.W.3d at
161. 

The last
area of contention relates to Skipworth=s referencing the testimony of the joint venturers that Skipworth Adid nothing wrong.@  Although this argument may
have been improper, we cannot say that it was incurable by instruction,
withdrawal, or trial court reprimand.  See
Standard Fire, 584 S.W.2d at 839. 
Moreover, there was considerable evidence in favor of the jury=s verdict.  Thus, we do not
believe this argument could have persuaded a juror of ordinary intelligence to agree
to a verdict contrary to that to which he would have agreed but for the
argument.  See Welch, 191 S.W.3d
at 161.  Therefore, Richmond Condominiums
has failed to show that the probability that the improper argument caused harm
is greater than the probability that the verdict was grounded on the proper
proceedings and evidence.  See
Standard Fire, 584 S.W.2d at 839.    

Accordingly,
we overrule Richmond Condominiums= final issue.








VII.
Conclusion 

Having
overruled Richmond Condominiums= four issues, we affirm the trial court=s judgment.                 

 

 

BOB MCCOY

JUSTICE

 

PANEL B:   LIVINGSTON, WALKER, and MCCOY, JJ.

 

WALKER, J. concurs without opinion.

 

DELIVERED: February 7, 2008











[1]Because of the subgrogation
agreement, we shall refer to the Appellant as both AWestern Heritage@ and ARichmond Condominiums,@ depending on the context of our
discussion.  





[2]Forcher=s trial testimony regarding the
presence of the painters varied from his deposition testimony wherein he
testified that the painters were not present on the day of the fire.





[3]The hydraulic fluid was moved to
this location by Forcher.  





[4]Henderson subsequently graduated
from the Wichita Falls Fire Academy.





[5]Graham
assumed his current position in May 1999 and has investigated more than four
hundred fires.  His background and
qualifications include ten years in the United States Navy as an electrician on
a nuclear submarine, four and one-half years as a Deputy Sheriff of Kitsap
County, Washington handling criminal investigations, and tenure as a Wichita
County Deputy Sheriff.  He holds an
associate=s
degree from Olympic College and a bachelor=s degree in applied arts and
sciences from Midwestern State University, and he was enrolled as a graduate
student in the criminal justice program at Midwestern State University. Graham
is also a certified police officer and certified arson investigator.  This latter certification requires completing a 128-hour course
through a fire investigation academy and passing a certification exam
administered by the Texas Commission of Fire Protection.





[6]Graham testified that fire
investigation standards provide that when there is evidence that points to one
cause, that is the conclusion you reach; however, here, there was no such
evidence.  In this instance, he could not
say that one cause was more likely than another.





[7]Graham stated, as Afar as cause, whether or not it was
intentionally set, I don=t have to go into any of that,
because it is quite frankly very possible this fire was intentionally set, and
that is one of the possible causes.@





[8]Skipworth nonsuited this
counterclaim shortly before trial.





[9]It appears that this standard of
review is applicable whether the appellate court is reviewing the imposition of
sanctions (which is almost always the case) or a decision not to impose
sanctions.  See Johnson v.
Davis, 178 S.W.3d 230, 242 (Tex. AppCHouston [14th Dist.] 2005, pet. denied); In re C.Z.B.,
151 S.W.3d 627, 636 (Tex. App.CSan Antonio 2004, no pet.); Whitaker v. Bank of El Paso,
850 S.W.2d 757, 762 (Tex. App.CEl Paso 1993, no writ); Home Owners Funding Corp. of Am.
v. Scheppler, 815 S.W.2d 884, 889 (Tex. App.CCorpus Christi 1991, no writ).





[10]These authorized sanctions range
from merely assessing discovery costs against the disobedient party to the more
serious Adeath penalty@ sanction of striking a disobedient
party=s pleadings and rendering a default
judgment against the party.  See Tex. R. Civ. P. 215.2(b)(1), (2), (3),
(4), (5), (8).





[11]While the proof of loss signed by
the joint venturers did authorize Western Heritage to sue responsible third
parties and did pledge the joint venturers= full cooperation in such a lawsuit, it did not address the
issue of whether the joint venturers thought that Skipworth was responsible for
the fire.





[12]Richmond Condominiums also urges us
to reverse and render monetary sanctions, but it does not point to any evidence
in the record as to monetary harm that would support the imposition of monetary
sanctions against the attorneys in any particular amount.  Accordingly, on the record before us, we
cannot say that the trial court abused its discretion by deciding not to impose
monetary sanctions.  See TransAmerican,
811 S.W.2d at 913 (stating that the choice of sanctions is within the sound
discretion of the trial court).





[13]Richmond Condominiums objected to
the reading of Wachsman=s deposition testimony based on
relevance.  The trial court overruled
this objection.